ZAYRE CORP. & another[1] *vs.* COMPUTER SYSTEMS OF AMERICA, INC., & another.[2]

Suffolk. April 10, 1987. — July 31, 1987.

Present: GRANT, CUTTER, & SMITH, JJ.

*Contract*, Equipment lease, Construction of contract, Performance and breach. *Estoppel*. *Consumer Protection Act*, Damages, Businessman's claim, Unfair act or practice, Lease. *Damages*, Consumer protection case.

At the trial of a lessor's counterclaim for breach of a computer system lease agreement, the judge did not err in concluding, on the basis of the testimony, that a certain computer system as a whole had become "surplus" within the meaning of the lease, that is, inadequate to the lessee's requirements, with the result that an option provision in the lessor's standard computer lease form was properly exercisable by the lessee so as to terminate the lease [566-567], and the lessee's sublease of the equipment under the terms of the agreement did not diminish its termination rights [567-568].

At the trial of a lessor's counterclaim on a theory of estoppel for damages based on an alleged misrepresentation of fact with respect to the sublease of a computer system under a lease agreement, the judge correctly determined that there was no basis of liability as against the lessee where the evidence warranted the finding that the lessee did not misrepresent or fail to disclose any pertinent fact in order to obtain the lessor's consent to the sublease arrangement [568-569], and that there was no basis of liability as against the sublessee where the lessor's reliance on the sublessee's misrepresentations as to its future intentions were unreasonable in the commercial context [569-570].

At the trial of a corporate lessor's counterclaim against the corporate lessee and the corporate sublessee of a computer system under written lease

---

[1] Comdisco, Inc., a Delaware corporation qualified to do business in Massachusetts and an established dealer in IBM (International Business Machines Corporation) computers and parts.

[2] Mr. Frank Keohane, the general partner of CSA Leasing Venture, No. 237, Limited Partnership, president of CSA, and a member of the Massachusetts bar who has been principally engaged in computer leasing. CSA had transferred the interest in the 1973 lease to CSA Leasing Venture, No. 237, before the controversy presented in this case arose.

and sublease agreements, there was no error in the judge's determination that any misrepresentation to the lessor by the sublessee with respect to the sublease during contract negotiations was insufficiently deceptive to give rise to any recovery under the provisions of G. L. c. 93, § 11. [570-571]

CIVIL ACTION commenced in the Superior Court Department on August 26, 1980.

The case was heard by *Elbert Tuttle*, J.

*Douglas G. Moxham (Peter J. Macdonald* with him) for the defendants.

*Lawrence M. Slater (Marc C. Laredo* with him) for the plaintiffs.

CUTTER, J. Computer Systems of America, Inc., and Keohane (see note 2, jointly referred to as CSA) appeal from a judgment of the Superior Court dismissing their counterclaims against Zayre Corp. (Zayre) and Comdisco, Inc. (Comdisco). Zayre and Comdisco by their complaint had sought declaratory relief against CSA. This complaint now has been waived. The five-day trial of this case, in January, 1986, before a Superior Court judge sitting *without* a jury, dealt only *with* the CSA counterclaims, which are summarized in the margin.[3] The judge, on February 18, 1986, made comprehensive findings (on which the facts stated below are based in major part), rulings, and a decision adverse to CSA.

*Background Facts and Findings*

Zayre is the owner of a chain of discount department stores. On October 26, 1973, Zayre, as lessee, and CSA, as lessor, entered into an eight-year lease of a computer system. The

---

[3] These CSA counterclaims alleged (1) that Zayre, and its sublessee, Comdisco, had committed a breach of § 12.2, the termination provision of the 1973 computer system lease (mentioned in the next paragraph of the text) from CSA to Zayre (see discussion, parts 1 and 2, *infra*); (2) that Zayre and Comdisco were estopped to deny liability under the 1973 lease (see discussion, parts 3, 4, and 5, *infra*); (3) that there had been a breach of Zayre's (and Comdisco's) obligation to perform the 1973 lease in good faith (see note 19, *infra*); and (4) that Zayre and Comdisco had each violated the provisions of G. L. c. 93A, §§ 2 and 11, and were liable to CSA for such violations (see discussion, parts 5 and 6, *infra*).

leased system consisted of a basic IBM 370/168 central processing unit (CPU) and some peripheral items, in the aggregate hereafter referred to as the CSA system. Zayre used the CSA system from a single computer center to perform a great variety of merchandise and financial functions (by the use of leased telephone lines) for all its retail stores (about 250 in number).

Because of rapid expansion between 1973 and 1979, Zayre needed to increase its computer capacity. Robert Hernandez, Zayre's manager of management information systems, prepared a report on Zayre's computer needs which concluded that the CSA system was operating at full capacity and that Zayre should increase computer power at once. The report offered seven alternative plans for increasing Zayre's computer capacity and recommended that Zayre add an attached processor (AP) to its existing CSA system. This, it was expected, would double the system's capacity.[4]

After discussion, members of Zayre's operating management initially adopted Hernandez's recommendation that the CSA system be upgraded. Hernandez's immediate supervisor, Charles Whittle, disagreed with Hernandez's recommendation, however, because it would require that the computer not be operated for a significant period ("downtime").[5] Whittle reported his disagreement to his immediate superior Mervyn Weich. Weich, nevertheless, adopted Hernandez's recommendation in a memorandum of October 26, 1979, to Zayre's president, Maurice Segall.

Zayre decided, both for financial and operating reasons, that it wanted to own, not lease, its computer system. CSA did not want to sell the system in place on Zayre's premises because of

---

[4] The Hernandez report predicted the CSA system's CPU use would soon reach over eighty-five percent of capacity with an even higher use during peak hours. When CPU use exceeds eighty-five percent, the computer slows down and response time for computer users increases.

[5] The proposed upgrade of the CSA system might well have required Zayre to shut down its computer system for between five and eight days thus causing a serious disruption in Zayre's operations. As to the amount of probable "downtime" the evidence was conflicting.

adverse economic and tax consequences.[6] Accordingly, Zayre sought bids for a comparable (already updated) system from various companies,[7] including CSA and Comdisco. (See note 1, *supra*.) Comdisco offered by letter of January 8, 1980, (a) to install for Zayre an already upgraded, "Model 3," IBM 370/168 computer and (b) to take from Zayre a sublease of the CSA system. Zayre's management determined that Comdisco's proposal was the best available and on March 6, 1980, executed a sales agreement for the Comdisco system and an agreement for a sublease (to Comdisco) of the 1973 CSA system. These two agreements were not to take effect unless CSA consented to the sublease to Comdisco of the CSA system.[8]

On March 6, 1980, Zayre wrote to CSA requesting CSA's consent to the sublease to Comdisco of CSA's system. By a letter of March 10, 1980, CSA replied to Zayre's request and

---

[6] Representatives of Zayre and CSA met in December, 1979, to discuss Zayre's computer problems. Among matters discussed was the possibility of terminating the CSA lease under § 12.2 of that lease. That provision, so far as now relevant, reads: "*12.2. Termination with Respect to Items of Equipment.* If the Equipment or any Item of Equipment having a model number, serial number and Invoice Cost as set forth in Schedule 1 hereto describing such Item in excess of $100,000 *shall be obsolete or surplus to Lessee's requirements, in Lessee's sole judgment*, then Lessee may, at its option, upon not less than 180 days' prior notice to Lessor, terminate this Lease with respect to such Equipment or Item on the date of payment of the thirty-seventh (37th) Periodic Rent installment or on any Periodic Rent installment payment date thereafter . . . provided that no Event of Default shall have occurred and be continuing" (emphasis supplied). Then follow provisions governing efforts to be made by the lessor and the lessee to obtain offers for the sale or lease of the terminated equipment — and for termination payments by the lessee in certain circumstances. There was testimony from a CSA representative that, at this meeting, CSA's representative asserted that the whole CSA system was not "obsolete" or "surplus" if Zayre was going to use thereafter an "upgraded" IBM 370/168.

[7] Each bidder was asked to submit a bid which included taking a sublease of the balance of the term of the 1973 lease of the CSA system.

[8] The original 1973 lease by CSA provided in § 22 that Zayre "shall have the right to sublease the [leased e]quipment for the remainder of the [l]ease [t]erm subject to . . . [CSA's] prior written approval . . ., which approval shall not be unreasonably withheld." The trial judge found that after March 6, 1980, "Zayre orally assured CSA that the sublease would be legitimate."

outlined various conditions to giving consent. On March 19, 1980, Comdisco replied to CSA, enclosing a copy of the proposed sublease. This letter of March 19, from Mr. Philip Hewes, assistant corporate counsel of Comdisco, to Mr. Keohane, president of CSA, said in part, "Comdisco is a leasing company and is proposing [further] to . . . sublease the [CSA] [e]quipment to one or more end users."[9]

The judge found that, in the letter of March 19, 1980, Mr. Hewes also informed CSA that "Comdisco had . . . 'no plans for the [CSA] equipment because the delivery date is not until May, 1980. . . .' Comdisco in fact planned [immediately] to . . . terminate the [1973 l]ease after CSA's consent to the sublease . . . and intentionally did not inform CSA of that intent in order to induce CSA to consent to the sublease. On March 21, 1980, CSA consented to the sublease subject to the letters from Comdisco to CSA, [including that] dated March 19, 1980. . . . CSA relied on the representations contained in the letters of Comdisco signed by [Mr.] Philip Hewes, dated March 19, 1980, and [one of] March 21, 1980, [not here relevant]. . . . CSA believed, based on its knowledge of the business and financial standing of Comdisco, that Comdisco would continue the [1973 l]ease . . . by subleasing the equipment to other users. If CSA had known of Comdisco's intent to terminate the [1973 l]ease . . ., CSA would not have consented to the sublease."

These findings were warranted by the documentary evidence and also by reasonable inferences drawn from the testimony of Mr. Hewes that prompt termination "was one of the options that . . . [Comdisco] had under the terms of the transaction" with Zayre and "that the company had a very strong intention

---

[9] The proposed sublease of the CSA system provided in par. 8 that Zayre agreed that Comdisco as sublessee "shall have the right to request" Zayre "to terminate the [p]rime [1973] [l]ease pursuant to . . . Section 12.2 of" that lease and that if such a request is made, Zayre "shall exercise its right to terminate under the [p]rime [l]ease." Comdisco also agreed "to indemnify and assume all of the costs associated with said termination." Thus CSA could have known of Comdisco's right to compel Zayre to exercise whatever rights Zayre had under § 12.2 of the 1973 lease, because CSA had a copy of the proposed sublease.

and probability of terminating that lease." Mr. Hewes also testified, in effect, that the existence of par. 8 (see note 9, *supra*) in the proposed sublease, a copy of which was sent to CSA, was a principal basis for Comdisco's position that CSA was on notice of the possibility (and even the likelihood) that Comdisco would ask Zayre to terminate the 1973 lease.

In any event, CSA on March 20, 1980, did consent to the sublease to Comdisco, subject to certain conditions designed to protect CSA's interest in the CSA system and to enable CSA to ascertain the location of the system from time to time. By the sublease Comdisco agreed "to indemnify and assume all of the costs [to Zayre] associated with . . . [a] termination" of the 1973 lease of the CSA system requested under § 12.2 of the 1973 lease. On April 7, 1980, Comdisco by letter asked Zayre to terminate the 1973 lease, and on April 25, 1980, Zayre did so on the ground that the leased equipment was "surplus" to Zayre's requirements. In a letter of May 2, 1980, CSA objected that Zayre was not entitled to terminate the 1973 lease under § 12.2 of that lease.

Various negotiations then took place between CSA and Comdisco. To permit the whole matter to be dealt with pending the determination of the rights of the parties under the 1973 lease, and reserving those rights, CSA on October 27 sold its interest in the leased equipment to Comdisco for $660,472.11 which was the termination value of the equipment referred to in § 12.2.[10]

The judge compared (a) the CSA system installed in Zayre's premises (i.e., the IBM 370/168 equipment slightly supplemented by Zayre between 1973 and 1979) with (b) the already

---

[10] The trial judge found that early termination of the 1973 lease caused the loss to CSA of twelve monthly rent payments, for a total of $661,380. Thus, the termination payment was substantially equal to the remaining rent. As to the balance of the loan secured by the equipment, at trial no evidence was offered by CSA. The judge also found (on evidence mentioned by him) that on October 27, 1981, the original lease termination date, the value of the CSA system was $400,000. CSA argues that, because it sold the CSA system for its termination value, it lost the opportunity to sell or lease the CSA system at the expiration of the lease, thereby losing the residual value of the system.

upgraded 370/168 computer to be purchased (and actually purchased) from Comdisco. Largely on the basis of exhibits before him, the judge concluded that the upgraded equipment, supplied by Comdisco, "increased Zayre's central processing capacity from 2 MIPS [one MIPS is the capacity to handle one million instructions per second] to 3.6 MIPS, allowed for expansion of memory capacity from 4 megabytes [storage capacity expressed in number of characters available for instant recall] to 7 megabytes . . ., provided for two processors to run simultaneously (versus one in the CSA system), provided for 8 channels (versus 7 in the CSA system), and allowed Zayre to run a multiple virtual system [MVS], . . . a new operating system that had been introduced by IBM since the installation [in 1973] of the CSA [s]ystem . . . . [The system purchased from Comdisco] also allowed Zayre to operate with new software equipment which could not be operated on the CSA System." The judge found that "Zayre could have arrived at its new computer configuration by updating and changing the CSA System. These updates and changes would have resulted in adverse financial problems to Zayre as a result of computer downtime[11] and [x] Zayre would have been left with a basic IBM 370/168, on which IBM notified customers of its intent to discontinue maintenance service."[12] The judge con-

---

[11] CSA contends that Zayre's reliance on the "downtime" risk (note 5, *supra*) as a reason for not upgrading the CSA system was based upon the circumstance that Zayre had an unusually large computer room permitting the new modified IBM 370/168 (already equipped with new features) to be installed next to the CSA System theretofore in the room. This was a circumstance which Zayre might reasonably take into account in deciding to buy an already upgraded IBM 370/168 system rather than to incur "downtime" (and possibly increased costs) in an upgrading process on the CSA System for it permitted the avoidance of "downtime."

[12] The judge recognized in his finding quoted in the text that "Zayre could have arrived at . . . [the] configuration [of the computer purchased by it from Comdisco] by updating . . . the CSA [s]ystem." This statement correctly states that the *upgraded* CSA system would have been the same as the modified IBM 370/168 purchased from Comdisco. The purchase, however, eliminated substantial downtime. The statement in the judge's finding quoted in the text following the letter "[x]" incorrectly interprets confusing testimony of Hernandez about IBM's intention to withdraw support for older products (usable on the "antiquated" CSA system) which had been

cluded that "the CSA System had become obsolete for Zayre's purposes in late 1979."

### Discussion

The trial judge's decision on CSA's counterclaims (see note 3, *supra*) is discussed in the following parts 1 to 6, inclusive.

1. The present case involves in most respects the same provision, i.e., § 12.2 of CSA's apparently standard computer lease form, considered in *Computer Syss. of Am., Inc.* v. *Western Reserve Life Assur. Co. of Ohio,* 19 Mass. App. Ct. 430, 438 (1985, hereafter the *Western Reserve* case). In that decision, a panel of this court considered a situation in which the lessee of computer equipment determined that the CPU of its leased computer was inadequate and decided to buy for itself a larger CPU than that leased by it from CSA. The input/output (I/O) equipment of its old system was still usable. The opinion held that, in the situation then before this court, analysis of § 12.2 permitted termination of the lease only as to the CPU. 19 Mass. App. Ct. at 434-435. The parties in that case had negotiated unsuccessfully "for replacement of the CPU with a larger CPU." The old I/O equipment in the *Western Reserve* case "could be used with either CPU and was in fact used with the new CPU" for a period of time. 19 Mass. App. Ct. at 433 n.4.

This court decided (at 435) that "[i]f the equipment, or some part of it, became technologically outmoded [i.e., "obsolete"] or no longer capable of handling Western Reserve's day-to-day business needs, the lease could be terminated as to the equipment or that item." This quotation should be read with the language of the *Western Reserve* case (at 437) which decided (on the facts then before this court) that § 12.2, as analyzed in detail in the opinion, "expresses an intention to allow termination of only those items of hardware which Western Reserve

supplanted by the more modern MVS operating system. The MVS system could by used with the system purchased from Comdisco but could not be used with the CSA system (without substantial modification of that system). We regard this misinterpretation as of minor importance in the context of other findings and the general evidence of the obsolete character of the CSA system as a whole if not upgraded.

found individually to be obsolete or surplus, rather than termination of the system as a whole (*unless the system as a whole had become obsolete or surplus*)" (emphasis supplied).[13]

We read the judge's conclusion as finding Zayre had decided that the 1973 CSA system *as a whole* had become inadequate for Zayre's purposes. The judge's conclusion plainly rested in major measure on the serious risk of "downtime"[14] if Zayre should resort to the complex and costly process of "upgrading" the CSA system.[15] This type of problem was not involved in the *Western Reserve* case.

2. The trial judge decided that "[b]etween Zayre and CSA, Zayre's rights and obligations under the [1973] lease were not diminished by the sublease to Comdisco. For Zayre's purposes the CSA [s]ystem remained incapable of carrying out Zayre's business operations effectively."[16] He ruled also that, because

---

[13] The opinion went on (at 435-436) to consider the effect of the word "surplus" in § 12.2 and said, "surplus pertains to Western Reserve's *over-all business purposes and operations*. If Western Reserve decided, for example, that its operations had changed to the point where the equipment was *no longer . . . capable of carrying them out effectively,* it would have the right to terminate the lease under the surplus prong of section 12.2" (emphasis supplied).

[14] At trial CSA took the position that Zayre's concern about "downtime" was a recent contrivance. There was conflicting evidence about the amount of downtime to accomplish an upgrading of the CSA system and about the extent to which various Zayre managers were concerned about that matter when the decision was made to install the already upgraded IBM 370/168. The judge, who heard and saw the witnesses, found in effect that downtime was a matter of serious importance to Zayre. This finding was not clearly erroneous. *First Pa. Mortgage Trust* v. *Dorchester Sav. Bank,* 395 Mass. 614, 621-624 (1985).

[15] One expert witness, engaged in the business of "upgrading" IBM computers, testified that, although a complete upgrading could be done, it is "heart surgery. The machine has to be totally ripped down and put out of commission for five to eight days, at a minimum" and this would be "round the clock." The witness concluded, "After you're done, you have a whole new face lift. You're totally changed! It's totally different! The only thing that remains the same is, they're both called 3[70/]168's, in name only."

[16] The judge did not pass upon whether CSA's consent to the sublease to Comdisco was required in view of the lease provisions (see note 9, *supra*)

Zayre was entitled to terminate the lease in any event (under the judge's view of this court's decision in the *Western Reserve* case), the sublease made no difference in the result. He concluded that Zayre was entitled under § 12.2 of the 1973 lease to terminate that lease and that doing so "did not constitute a breach of the lease."

3. CSA now contends that Zayre is liable to it under an "estoppel" theory because CSA relied to its detriment upon a misrepresentation of fact by Zayre, express or implied. The only possible misrepresentation to CSA by Zayre mentioned in the judge's findings was that one "representative of Zayre assured CSA that the sublease between Zayre and Comdisco would be a legitimate sublease."[17] The judge decided that the sublease was in fact "legitimate" and that "Zayre did not misrepresent or fail to disclose any pertinent fact." This view was well warranted by the evidence that Zayre, prior to April, 1980, was not informed by Comdisco (as one of its representatives testified) of any intention by Comdisco to request termination by Zayre of the 1973 CSA lease. Indeed, Comdisco had talked to Zayre representatives of further subleases to other

---

that CSA's "approval [of the sublease] shall not be unreasonably withheld." This provision obviously has been adopted from similar provisions in real estate leases. See Restatement (Second) of Property (Landlord & Tenant), § 15.2, comment h (1977); *Tage II Corp.* v. *Ducas (U.S.) Realty Corp.,* 17 Mass. App. Ct. 664, 666-667 (1984), and cases cited. It may well be that for CSA to have refused approval of the sublease for any reason other than the financial condition of Comdisco, the sublessee, would have been held unreasonable. See Schwartz, Lease Drafting in Massachusetts, § 9.7 (1961); 1 Friedman, Leases, § 7.304a-c (2d ed. 1983). The evidence showed that subleases by lessors and lessees of computer systems, at times at least, had tax advantages. When Zayre sought bids for the sale to it of a new computer system, it specified that the bidder must provide a sublease of the CSA system. These circumstances showing that subleases were not unusual in computer leasing (and in connection with sale deals) might have bearing upon whether a refusal to approve the sublease would have been unreasonable.

[17] This finding probably was based upon Mr. Keohane's testimony that Weich of Zayre had informed him that the sublease would be a "firm sublease for the remaining term" of the 1973 CSA lease and that he (Mr. Keohane) believed (after reading the various letters of March, 1980, and the proposed sublease) that Comdisco was subleasing the CSA system for the balance of the term.

users of computer equipment. When Comdisco's request for Zayre to terminate the 1973 lease was made (preceded by a telephone call about April 5, 1980, to Whittle at Zayre from Mr. Hewes), Whittle was "very much" surprised.[18] We perceive no basis for holding Zayre liable to CSA under principles discussed in Restatement (Second) of Contracts, § 90 (1981). See *Loranger Constr. Corp.* v. *E.F. Hauserman Co.,* 6 Mass. App. Ct. 152, 154-159, *S.C.,* 376 Mass. 757, 760-763 (1978).

4. CSA contends that even if Zayre made no misrepresentations to obtain CSA's consent to the sublease of the CSA system, Comdisco is estopped to request Zayre to terminate the 1973 lease. The judge found that CSA relied upon the language already quoted from Comdisco's letter of March 19, 1980, misrepresenting Comdisco's intentions with respect to the 1973 lease. See note 9, *supra,* and related text of this opinion. The judge, however, correctly took the position that Comdisco's misrepresentations should be viewed in the context in which they took place. He pointed out that Comdisco, Zayre, and CSA were "all . . . large sophisticated corporations that can presumably look out for themselves." He concluded that CSA could not "reasonably believe that Zayre had any basis for assuring the future conduct of Comdisco" in view of CSA's knowledge of the terms of the sublease. With this result we agree.[19]

5. For recovery against Comdisco on principles discussed in the *Loranger Constr. Corp.* case, 6 Mass. App. Ct. at 155,

---

[18] The judge was aware, of course, that Zayre had insisted on an indemnity agreement by Comdisco in the sublease which would take Zayre out of its financial responsibility for the CSA system and under which "Comdisco would bear all of the costs related to the termination." There was testimony that Zayre would not have agreed to the sublease (which required Zayre to terminate the 1973 lease) without the indemnification.

[19] The judge also correctly took the position that Zayre had committed no breach of any "implied covenant of good faith and fair dealing." See *Druker* v. *Roland Wm. Jutras Assoc., Inc.,* 370 Mass 383, 385 (1976); Restatement (Second) of Contracts, § 205 (1981). Zayre had not been shown by CSA to have made any representation to it which Zayre itself did not believe. The judge also correctly decided for essentially similar reasons that Zayre had not been shown to have engaged in any unfair and deceptive trade practice in violation of G. L. c. 93A, § 11.

and 376 Mass. at 760-761,[20] there must be a showing that CSA "reasonably" relied on Comdisco's misrepresentation in the circumstances here disclosed.[21] The judge had sufficient basis for concluding that "CSA, as a sophisticated business entity [indeed, with a president trained as a lawyer and an active participant in the transaction], could not reasonably view Comdisco's misrepresentation as any assurance that there would be no termination" of the 1973 lease.

6. Reasonable reliance, however, is not necessarily a prerequisite of recovery under G. L. c. 93A, § 11. See *International Fid. Ins. Co.* v. *Wilson,* 387 Mass. 841, 850 (1983). Liability (and the extent of liability) under c. 93A turns on an appraisal of the allegedly culpable conduct of the entity charged with violating that chapter. Here, as already noted, the judge found that CSA would not have consented to the sublease to Comdisco if CSA had known Comdisco's intention to terminate the 1973 lease. That consent, even if unnecessary (see note 16, *supra,* was advantageous[22] to Comdisco. Without that consent, CSA at least could have delayed or forced revision of the Zayre-Comdisco purchase of a new computer. It was open to the judge to determine that Comdisco's conduct amounted to a violation of c. 93.A, § 11, because it was within "at least the penumbra of some common-law, statutory, or other established concept of unfairness . . . [or] is immoral, unethical, oppressive, or unscrupulous."[23] See *Levings* v. *Forbes & Wall-*

---

[20] *See Greenstein* v. *Flatley,* 19 Mass. App. Ct. 351, 357 (1985). See also *O'Blenes* v. *Zoning Bd. of Appeals of Lynn,* 397 Mass. 555, 558 (1986).

[21] One such circumstance is the obscurity of § 12.2 of the 1973 lease (which caused this court significant difficulty in the *Western Reserve* case, 19 Mass. App. Ct. at 433-438). Section 12.2 presumably was drafted by CSA. See Restatement (Second) of Contracts, § 206 (1981). Of course, all the present parties acted in 1980, long before March 4, 1985, when the *Western Reserve* case first gave any guidance about the meaning of § 12.2.

[22] There was evidence also that Comdisco's representatives were aware that termination would harm CSA and cause loss of some rental payments and at least possible loss of the residual value of the CSA system after the effective date of the termination. See note 10, *supra.*

[23] Even in vigorous competition among business concerns, misrepresentations may be so seriously deceptive and harmful as to permit some recovery

*ace, Inc.,* 8 Mass. App. Ct. 498, 503-504 (1979). See also *Spence* v. *Boston Edison Co.,* 390 Mass. 604, 616 (1983). Compare *Business Brokers Intl. Corp* v. *Roderick, post* 957 (1987).

Whether the Comdisco misrepresentation was sufficiently and effectively deceptive to give rise to any recovery at all under G. L. c. 93, § 11, and whether it should give rise to more than a single recovery, is a matter essentially for the determination of the trial judge, who has heard and seen the witnesses. He could reasonably consider the case to be more like the *Levings* case, 8 Mass. App. Ct. at 504, than like the situation underlying *Wang Laboratories* v. *Business Incentives, Inc.,* 398 Mass. 854, 855-857 (1986). See and compare *Wasserman* v. *Agnastopoulos,* 22 Mass. App. Ct. 672, 678-681 (1986). We accord deference to his judgment on the issues. We cannot say that, on the present record, his conclusions were error as matter of law.

*Judgment affirmed.*

---

for the injury really caused by them. Indeed, in some circumstances, even half-truths may constitute serious deception. See *Kannavos* v. *Annino,* 356 Mass. 42, 48 (1969). Business strategy "in the rough and tumble of the world of commerce" should not use conscious misrepresentation as a competitive weapon.