Fahey, J.
The plaintiff, Family Bank, FSB (“Bank”), brings this action against the defendant, Arthur J. McCabe, II (“McCabe”), alleging Negligence/Malpractice (Count I), Negligent Misrepresentation (Count II), Breach of Fiduciary Duty (Count III), Promissory Es-toppel (Count IV), Conversion (CountV), Fraud, Deceit and Intentional Misrepresentation (Count VI), and Violation of G.L.c. 93A (Count VII). The defendant now seeks summary judgment on all counts. The plaintiff opposes the motion and seeks summary judgment on Counts III, V, and VII. For the reasons stated below, the plaintiffs partial motion for summary judgment is DENIED, and the defendant’s motion for summary judgment is ALLOWED.

Background

The undisputed material facts as established by the summary judgment record are as follows. The defendant, McCabe, is an attorney licensed to practice law in Massachusetts. He has been a member of the bar of the Commonwealth of Massachusetts since 1974. Throughout 1998, McCabe and his law firm were counsel to Tri-Star Technologies Co., Inc. and Tri-Star Reality Trust (collectively “Tri-Star").[1] McCabe has never served as an attorney for the plaintiff Bank.
Sometime prior to 1998, Tri-Star borrowed funds from the Bank, pledging substantially all of its assets as collateral. In early 1998, Tri-Star was in default of *634 its obligations to the Bank under a Revolving Credit Agreement. Pursuant to its default, Tri-Star signed on May 27, 1998 a term sheet letter with the Bank setting out the material terms of a forbearance agreement between the parties.[2] McCabe was not a signatory to the May 27, 1998 letter.
After signing the May 27, 1998 letter, and during the summer of 1998, Tri-Star entered into negotiations for the sale of its Assembly Division with EA Industries (“EA”) and EA’s subsidiary, Tanon Manufacturing, Inc. In relation to the sale, EA’s vice president and general counsel, Howard Kamins, prepared and sent a letter dated July 27, 1998 to McCabe’s office. The letter was signed by Paul E. Finer, President of Tri-Star, and Kamins. The letter set out conditions of the sale, and stated that Tri-Star and EA agreed to deliver to McCabe’s office various documents in connection with the closing; such documents were to be deemed deliveries in escrow.[3] According to the terms of the letter, Tri-Star was specifically required to obtain certain documentation.[4]
On July 29,1998, Kamins sent another letter which was agreed to and accepted by Finer. Under the terms of this letter, EA confirmed that the initial portion of the purchase price of $300,000.00 would be sent to Tri-Star’s attorneys escrow account.[5] Before Tri-Star was able to complete a sale of its Assembly Division, however, Tri-Star had to seek relief from a standing preliminary injunction restricting Tri-Star’s ability to sell its assets. Pursuant to a July 28, 1998 Order by the Essex Superior Court (Whitehead, J.), the injunction was modified to allow such a sale.[6] Neither the Bank nor McCabe was named as a party to this Order.
Tri-Star and EA then entered into an Agreement of Purchase and Sale (“P&S Agreement”) for the sale of Tri-Star’s Assembly Division on or about July 31, 1998. The P&S Agreement, in relevant part, read: “pursuant to an agreement dated May 27, 1998 between the Bank and [Tri-Star] all payments made to [Tri-Star] pursuant to this Agreement and the promissory note delivered in connection herewith shall be delivered to the Bank by or at the direction of [Tri-Star] . . .” McCabe was not a signatory to the P&S Agreement. On or before July 31, 1998, McCabe’s law firm received a $300,000.00 wire transfer from EA. However, Tri-Star had not yet secured all the necessary documentation as required under the July 27, 1998 letter. Kamins provided instructions to Tri-Star and McCabe that the $300,000.00 was not to be released from escrow until Tri-Star had fulfilled all of its obligations under the July 27, 1998 letter. EA agreed to take over the operational control of the Assembly Division while Tri-Star continued to make efforts to secure the necessary documents. On or about July 31, 1998, Finer faxed a memo to Mark Lawer, the Bank’s Senior Vice President, stating: “Mark, Tanon [EA] takes over Assembly as of tomorrow!! See attached letter from EAI/Tanon and memo from me. The $300K has been wired and is in our escrow account and will not be touched.”
Subsequently, on or about August 4, 1998, counsel for the Bank sent a letter to McCabe stating, “[t]he Bank is informed and believes that you are currently holding in escrow, .or otherwise, approximately $300,000.00, representing the proceeds of such sale,” and asked McCabe to “kindly acknowledge in writing that once any conditions of escrow are satisfied, you will turn over such proceeds to the Bank.” McCabe sent a letter, dated August 5, 1998, to counsel for the Bank stating that he was, indeed, holding the $300,000.00 in escrow, and that “[u]pon satisfaction of the escrow terms, the proceeds of the sale will be paid directly to the Bank.” In the letter, McCabe also stated, “I hope to have these matters resolved by tomorrow.”
On August 14, 1998, Tri-Star was involuntarily petitioned into bankruptcy. By this date, Tri-Star had still not yet satisfied all of its obligations specified in the July 27, 1998 letter. One week later, on or about August 21, 1998, Tri-Star, through its bankruptcy counsel, Attorney Bruce Smith, filed an emergency motion with the Bankruptcy Court. Specifically, TriStar petitioned the Bankruptcy Court to use the $300,000.00 to fund Tri-Star’s operating expenses. The Bank opposed Tri-Star’s motion, arguing the $300,000.00 was its property and could not be used for Tri-Star’s operating expenses. The Bankruptcy Court held a preliminary nonevidentiary hearing on August 25, 1998, and made findings on an emergency basis. Over the Bank’s objections, the Bankruptcy Court allowed Tri-Star to use the $300,000.00 to pay its obligations.
Following the Bankruptcy Court’s preliminary ruling, on or about August 25, 1998, McCabe and another attorney from his office, Mark Johnson, contacted EA’s counsel to ask permission to release the escrow funds pursuant to the Bankruptcy Court’s order. EA authorized the release of the funds to TriStar’s bankruptcy estate.[7] Moreover, McCabe received authority from Finer to release the funds. Thereafter, McCabe released the $300,000.00 to Tri-Star’s bankruptcy estate.
The Bankruptcy Court scheduled a full evidentiary hearing for August 31, 1998, to address the Bank’s objections to Tri-Star’s use of the $300,000.00 to pay for operating expenses. Then, on or about August 28, 1998, the Bank filed an Emergency Assented-To Motion to Convert August 31, 1998 Evidentiary Hearing to Status Conference and to Schedule New Hearing Date. The Bank asked that the evidentiary hearing be continued to September 18, 1998. The Bank and Tri-Star then entered into a Stipulation, which was entered as a Stipulated Order by the Bankruptcy Court. Pursuant to the Stipulated Order, the Bank agreed to allow Tri-Star to use the Bank’s collateral up until a potential sale of Tri-Star’s operating assets to *635 Hoff Family Associates, L.P. (“HFA”), occurred.[8] The deal with HFA never materialized, and the Bank released its lien on the assets of the Assembly Division when an agreement, dated December 4, 1998, was reached between EA and the Bank, pursuant to which the Bank received $400,000.00.

Discussion

Summary judgment shall be granted only where there are no genuine issues of material fact in dispute and where the summary judgment record entitles the moving party to judgment as a matter of law. Cassesso v. Comm’r of Corr., 390 Mass. 419, 422 (1983); Cmty. Nat’l Bank v. Dawes, 369 Mass. 550, 553 (1976); Mass.R.Civ.P. 56(c). In deciding a motion for summary judgment, the court views the facts “in the light most favorable to . . . [the non-moving party], taking all the facts set forth in its supporting affidavits as true.” G.S. Enters., Inc. v. Falmouth Marine, Inc., 410 Mass. 262, 263 (1991). The moving party bears the burden of affirmatively demonstrating the absence of a genuine issue of material fact on every relevant issue. Pederson v. Time, Inc., 404 Mass. 14, 17 (1989). Once the moving party demonstrates the absence of a triable issue, “the non-moving party may not simply rest on pleadings, ‘but his response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial.’ ” Correllas v. Viveiros, 410 Mass. 314, 317 (1991), quoting Mass.R.Civ.P. 56(e). “A complete failure of proof concerning an essential element of the non-moving party’s case renders all other facts immaterial” and mandates summary judgment in favor of the moving party. Kourouvacilis v. General Motors Corp., 410 Mass. 706, 711 (1991), citing Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).
I. Negligence/Malpractice and Breach of Fiduciary Duty Claims
The basic premise of the Bank’s claims of negligence/malpractice and breach of fiduciary duty is that McCabe owed a duty to the Bank, by virtue of holding money in escrow which was earmarked for payment to the Bank, and breached his duty when he failed to deliver the money to the Bank. McCabe maintains that the Bank’s negligence/malpractice and breach of fiduciary duty claims must fail because the Bank has not demonstrated that McCabe owed any duty of care to the Bank.
To establish a claim for negligence/malpractice against the defendant, a plaintiff must establish a “legal duly owed by the defendant to the plaintiff, and a breach of that duty proximately resulting in the injury.” Davis v. Westwood Group, 420 Mass. 739, 742-43 (1995). The determination of whether a defendant owes a duty of care to the plaintiff is a question of law for the court. O’Sullivan v. Shaw, 431 Mass. 201, 203 (2000). With respect to a question of attorney negligence, “[a]bsent an attorney-client relationship, the court will recognize a duiy of reasonable care if an attorney knows or has reason to know a nonclient is relying on the services rendered.” Lamare v. Basbanes, 418 Mass. 274, 276 (1994). Notably, however, “the court will not impose a duty of reasonable care on an attorney if such an independent duly would potentially conflict with the duiy the attorney owes to his or her client.” Id.
It is undisputed that the Bank and McCabe were not in an attorney-client relationship. McCabe was only representing Tri-Star in the transactions involved in this matter. Therefore, this court will find that a duiy existed if McCabe knew or had reason to know that the Bank was relying on his services. Id. The Bank maintains that the terms contained in the May 27, 1998 term sheet letter, the Essex Superior Court Order, and the P&S Agreement establish McCabe’s duty to turn over any funds from the Assembly Division sale immediately to the Bank.[9] This court disagrees.
The May 27, 1998 term sheet letter, which described the terms of the forbearance agreement between the Bank and Tri-Star, stated: “The Borrower agrees that as of the date of closing of the above transactions the Borrower shall pay the Bank an amount equal to $600,000 in cash (in addition to the assignment of the $250,000 note) that may be from the above sources.” (Emphasis added.) One of the “above sources” was the projected proceeds from the sale of the Assembly Division. However, there was no clear directive in the letter that mandates the funds be paid directly to the Bank immediately upon sale of its Assembly Division. Similarly, there was no directive in the Essex Court Order. The Order merely stated that the sale of the Assembly Division should be consistent with the May 27, 1998 term sheet letter, and thus does not establish any duty on the part of McCabe to the Bank.
The same is true of the P&S Agreement. The P&S Agreement stated: “pursuant to an agreement dated May 27, 1998 between the Bank and [Tri-Star] all payments made to [Tri-Star] pursuant to this Agreement and the promissoiy note delivered in connection herewith shall be delivered to the Bank by or at the direction of [Tri-Star] . . .” (Emphasis added.) McCabe was never authorized by either Tri-Star or EA to release the funds from escrow. Indeed, the required closing documents were not obtained by Tri-Star, as required by the July 27, 1998 letter between EA and Tri-Star; therefore, the funds remained in escrow, and McCabe had no authority to release them. This is further supported by McCabe’s own communication with the Bank on August 5, 1998, when he stated: “[u]pon satisfaction of the escrow terms, the proceeds of the sale will be paid directly to the Bank.” As of August 5, 1998, the terms of escrow were not satisfied.
Additionally, McCabe could not have had a duiy to immediately deliver the $300,000.00 to the Bank because “such an independent duty would potentially *636 conflict with the duly the attorney owes to his or her client.” Lamare, 418 Mass. at 276. McCabe clearly had a duty to Tri-Star, his client, and to EA, both parties to the escrow, to adhere to the terms of the escrow agreement. See Kaarela v. Birkhead, 33 Mass.App.Ct. 410, 412-13 (1992), quoting Jenkins v. Bacon (noting that the escrow agent’s duty is “to keep the deposit... [and] not dispose of it without the express or implied authority of the depositor”); Discipline of Two Attorneys, 421 Mass. 617, 626 (1996) (escrow holder has an obligation to the parties to an escrow agreement to carry out the terms of the agreement). Any immediate distribution of funds before the terms of escrow were satisfied, i.e. before Tri-Star had furnished all the necessary documents, would constitute a breach of that duty. Indeed, it was not until August 25, 1998 that McCabe received authority from EA and Tri-Star to release the funds from escrow, at which time McCabe released the funds consistent with the August 25, 1998 Bankruptcy Court Order.
Similarly, McCabe had no fiduciary duty to the Bank. To support its claim for breach of fiduciary duty, the Bank relies on the Supreme Judicial Court’s opinion in Gen. Exch. Ins. Corp. v. Driscoll, 315 Mass. 360 (1944), in which the court held that an attorney holding earmarked funds that belong to a third party is under an obligation to deliver the proceeds to the third party. In Driscoll, the defendant attorney received settlement monies on behalf of his client arising out of an automobile accident. 315 Mass. at 361. The attorney, after retaining fees and expenses, paid over the settlement to his client. Id. at 362. The settlement included money, paid in the form of two drafts, one for personal damages and the other for property damages. Id. at 361-62. Prior to the settlement, the client had entered into “subrogation agreements” with an insurance company, under which the client subrogated to the insurance company all rights he had for damage to his automobile. Id. at 361. The SJC held that the attorney was personally liable to the insurance company for money given to his client which was specifically earmarked for property damages, because the insurance company had a right to the money under the “subrogation agreements.” Id. at 364-66.
The SJC has consistently distinguished Driscoll in holding that an attorney is not personally liable to a third party for the funds where the attorney is in possession of funds that are not earmarked for or belong to the third party. See Frontier Enters., Inc. v. Anchor Co. of Marblehead, 404 Mass. 506, 513 (1989); Blue Cross of Mass., Inc. v. Travaline, 398 Mass. 582, 588-89 (1986). The case at bar is also readily distinguishable from Driscoll As already established herein, there is nothing in the summary judgment record to show that the funds of the Assembly Division sale were to be paid directly to the Bank immediately upon sale. Nothing in the contents of the May 27,1998 term sheet letter, the Essex Court Order, the P&S Agreement, or the August 5, 1998 letter from McCabe establishes that the $300,000.00 was earmarked for the Bank. Moreover, the funds were to be held in escrow until all the conditions of escrow were met. Therefore, even if the funds were earmarked for the Bank, McCabe did not have the authority to distribute the funds prior to all escrow conditions being satisfied.
Contrary to the Bank’s assertions otherwise, the documents in the record demonstrate that the $300,000.00 in the escrow account was not earmarked for the Bank and was properly held by McCabe in escrow until completion of the escrow terms. Accordingly, McCabe is not personally liable to the Bank for these funds.
II. Promissory Estoppel
The Bank next contends that McCabe is liable under a theory of promissory estoppel. A claim for promissory estoppel exists if “(1) a promisor makes a promise which he should reasonably expect to induce action or forbearance of a definite and substantial character on the part of the promisee, (2) the promise does induce such action or forbearance, and (3) injustice can be avoided only by enforcement of the promise.” Loranger Constr. Corp. v. E.F. Hauserman Co., 6 Mass.App.Ct. 152, 154 (1978). The Bank’s claim for promisory estoppel is based solely upon an allegation that McCabe made a false promise, in bad faith, in his August 5, 1998 letter to the Bank. See Boylston Dev. Group, Inc., v. 22 Boylston St. Corp., 412 Mass. 531, 542 n.17 (1992), citing Loranger Constr. Corp., 6 Mass.App.Ct. at 155 (stating that a claim of promissory may be based upon “reliance on a misrepresentation of future intent”).
The Bank has failed to offer any evidence to support this claim. The August 5, 1998 letter from McCabe to the Bank, stated, in relevant part, that he would deliver the $300,000.00 “(u]pon satisfaction of the escrow terms,” and that he “hope(d] to have these matters resolved by tomorrow.” This court can discern no false promise, false assurance, or misrepresentation in these statements. McCabe merely was relating the current situation to the Bank, and stated his “hope” that the matters would be resolved shortly. His statements were entirely consistent with his instructions from his client, Tri-Star, and the other party to the escrow agreement, EA. Accordingly, the Bank’s claim for promissory estoppel must fail. See Loranger Construction Corp. v. E.F. Hauserman Co., 6 Mass.App.Ct. at 156-59.
III. Conversion
The Bank also argues that by withholding the $300,000.00 from the Bank, McCabe is liable under a theory of conversion. “Conversion is an intentional exercise of dominion or control over a chattel which so seriously interferes with the right of another to control it that the actor may justly be required to pay the other the full value of the chattel.” Restatement (Second) Torts 222A (1965); see also Third Nat’l Bank of Hampden County v. Cont’l Ins. Co., 388 Mass. 240, 244 *637 (stating that “(cjonversion requires the exercise of dominion or control over the personal property of another”). As discussed above, the $300,000.00 at issue was never earmarked for the Bank, and was thus never the personal property of the Bank. Indeed, the Bank never had a right to control these funds until all the conditions of escrow were satisfied. The conditions were not met and the parties to the escrow agreement did not direct McCabe to release the funds prior to the Bankruptcy Court’s Order permitting the release of the funds. Therefore, the Bank never had a right to exercise immediate control over the $300,000.00. Accordingly, the Bank has no valid claim for conversion against McCabe.
IV. Negligent Misrepresentation and Fraud, Deceit and Intentional Misrepresentation
The Bank next alleges that McCabe has committed negligent misrepresentation, fraud, deceit, and intentional misrepresentation by telling the Bank that he could not release the funds because not all of the terms of the escrow had been met. To establish a claim for negligent misrepresentation, a plaintiff must show that “the defendant, in the course of his business, made a false representation of material fact for the purpose of inducing the plaintiff to rely upon it, and that the plaintiff did rely upon the representation as true, to his damage.” Kitner v. CTW Transport, Inc., 53 Mass.App.Ct. 741, 749 (2002), citing Nycal Corp. v. KPMP Peat Marwick LLP, 426 Mass. 491, 496 (1998). To prove a claim for fraud, deceit and intentional misrepresentation, the plaintiff is similarly required to establish the defendant made a false representation of material fact, and additionally, that the statement was made “for the purpose of inducing the plaintiff to act thereon . ..” Danca v. Taunton Savs. Bank, 385 Mass. 1, 8 (1982), quoting Barrett Assocs. v. Aronson, 346 Mass. 150, 152 (1963).
The evidence in the summary judgment does not support the Bank’s claims for either negligent misrepresentation, fraud, deceit or intentional misrepresentation. Importantly, McCabe never made any false representation of material fact to the Bank. Both Kamins, representing EA, and Finer of Tri-Star, have provided uncontested affidavits which state that the $300,000.00 was to remain in escrow until the required documentation for the sale of the Assembly Division had been obtained. Furthermore, the terms of the numerous letters in the summary judgment record show that McCabe was not to release the funds from escrow until all the conditions of the agreement were met or until the parties directed him to do so. McCabe conveyed an accurate representation of the current circumstances to the Bank in an August 5, 1998 letter, and therefore, no misrepresentation occurred.
V. Violation of G.L.c. 93A
Finally, the Bank alleges that McCabe’s conduct with respect to the $300,000.00 constituted a violation of G.L.c. 93A. There is insufficient evidence in the summary judgment record to establish that McCabe engaged in any “unfair or deceptive acts or practices” in violation of G.L.c. 93A. G.L.c. 93A 2 and 11. The Bank has failed to show that the defendant’s acts were in violation of any statutory or common-law duly, or “within at least the penumbra of some common-law, statutory, or other established concept of unfairness . . . [or] is immoral, unethical, oppressive, or unscrupulous.” Mass. Farm Bureau Fed’n, Inc. v. Blue Cross of Mass., Inc., 403 Mass. 722, 729 (1989), quoting Zayre Corp. v. Cmputer Sys. of Am., Inc., 24 Mass.App.Ct. 559, 570 (1987) (internal quotations omitted). McCabe’s conduct was entirely consistent with the duty owed to his client, Tri-Star, and the parties to the escrow agreement, Tri-Star and EA.

ORDER

For the reasons stated above, it is hereby ORDERED that the plaintiffs motion for summary judgment on Counts III (Breach of Fiduciary Duty), V (Conversion), and VII (Violation of G.L.c. 93A) is DENIED, and the defendant’s motion for summary judgment on all counts is ALLOWED.

McCabe and his law firm did not represent Tri-Star in bankruptcy matters.

The Letter, in relevant part, stated:
5. Borrower to cause the occurrence of new funds to be obtained by the company in the minimum amounts as noted below. The closing of these funds shall occur on or before the closing of the Agreement with the Bank.
Sale of Assembly division $750,000
Private equity $200,000
State Funds/other financing $500,000
The Borrower represented to Bank that proceeds from the assembly sale shall be received in two parts. The first payment shall be in the amount of $500,000 received from buyer at the time of closing and the second part in the amount of $250,000 by December 31,1998. The $250,000 shall be in the form of a note or marketable stock. The stock is to be registered with the SEC and redeemable for cash on or before December 31, 1998. The Bank shall obtain an assignment of the note and stock at closing and shall retain all payments made on that note. The Bank agrees to turn over the note or stock to the Borrower upon the occurrence of a principal reduction amounting to $800,000.
The Borrower agrees that as of the date of closing of the above transactions the Borrower shall pay the Bank an amount equal to $600,000 in cash (in addition to the assignment of the $250,000 note) that may be from the above sources.
This term sheet does not constitute a commitment on part of the Bank. This proposal is subject to approval from the Bank’s loan committee and until such time that a forbearance agreement is executed no agreement exists between the parties.

The July 27, 1998 letter, in relevant part, stated:
The delivery of the Purchaser [EA] Documents and the Company [Tri-Star] Documents shall be deemed deliveries in escrow. When you have received the Purchaser Documents and the Company Documents you shall send *638 telecopied notice to that effect to me upon receipt of that notice, EA shall authorize the release of the portion of the Purchase Price payable at Closing (“Closing Price”). When the receipt of the entire Closing Price has been received you shall send telecopied notice to that effect to me. When such notice is sent the escrows created pursuant hereto shall be deemed terminated and the date of such notice shall be the Closing Date for purposes of the Agreement. In addition, on that date you shall deliver (i) the Purchaser Documents to the Company and (ii) the Company Documents via Federal Express to me.

The required documentation, listed in the July 27, 1998 letter, included:
1. The Bill of Sale duly executed by [Tri-Star].
2. The Agreement duly executed by [Tri-Star].
3. The Lease duly executed by [Tri-Star].
4. An opinion of your firm as counsel for [Tri-Star], delivered to [EA] pursuant to the instructions of [Tri-Star], dated the date of the Closing, substantially in the form approved by counsel for EA.
5. All necessary consents of third parties under the contracts, agreements, leases, insurance policies and other instruments of [Tri-Star] to the consummation of the transactions contemplated hereby, which consents shall not provide for the acceleration of any liabilities or any other detriment to [EA] or [Tri-Star].
6. A certificate or certificates, dated the Closing Date and signed by the secretary or assistant secretary of [Tri-Star], certifying the truth and correctness of attached copies of [Tri-Star’s] Articles of Incorporation (including amendments thereto), by-laws (including amendments thereto), and resolutions of the board of directors of [Tri-Star] approving [Tri-Star’s] entering into the Agreement and the consummation of the transactions contemplated thereby.
7. A certificate, dated as of a date no earlier than five days prior to the Closing Date, duly issued by the Secretary of State of Massachusetts stating that [Tri-Star] is active on the records of the corporation division and that all state franchise and/or income tax returns and taxes for [TriStar] for all periods prior to the Closing have been filed and paid.

The July 29, 1998 letter, in relevant part, stated:
This letter will confirm that the initial portion of the Purchase Price of $300,000 will be sent via wire transfer on July 30, 1998 to the escrow account of [Tri-Star’s] attorney and [EA] and [Tri-Star] agree that the Closing shall for all purposes be deemed to occur at 11:59 p.m. local time on July 31, 1998 and that the transfer of the Assets and the obligations of [EA] under the Lease and the Agreement will be effective at such time.

The Essex Superior Court Order stated:
The preliminary injunction entered on November 14, 1997 is modified to exclude from its prohibition the sale of the assembly division of Tri-Star, provided that such sale is undertaken and the proceeds expended consistent with the forbearance agreement entered into by Tri-Star, Family Bank and others on May 27, 1998.

In a letter dated August 25, 1998, addressed to Kamins, Johnson stated, “[plursuant to our telephone conversation, I am confirming that you have authorized the law firm of Arthur J. McCabe & Associates, P.C. to release $300,000 from an escrow account...”

The Stipulated Order, in relevant part, provided:
S. The Debtor [Tri-Star] proposes to sell substantially all of its operating (non-real estate) assets for Hoff Family Associates, L.P. (“HFA”), pursuant to the terms of that certain Motion for Order Authorizing and Approving Private Sale of Property of the Estate and to Assign Leases of Personal Property and to Approve Notice of Intended Sale filed with the Bankruptcy Court on September 16, 1998 (the “Hoff Offer”). Provided that, if and only if, “Good Receivables” (as so defined in the Hoff Offer) exceed $1.3 million at the time any sale to HFA is closed, the Secured Party [Bank] shall be deemed to consent to the sale of the Debtor’s assets to HFA pursuant to the terms of the Hoff •Offer. To the extent that Good Receivables are less than $1.3 million at such time, the Secured Party may determine in the exercise of its sole and absolute discretion whether or not to consent to the Hoff Offer or otherwise to provide any financing to HFA. It is a condition to the Hoff Order that the sale contemplated thereby occur on or before October 7, 1998 (the ‘Termination Date”).
T. Under the terms and conditions set forth herein, the Secured Party is willing to permit the Debtor to use the Secured Party’s cash and non-cash collateral up to and until the Termination Date.

McCabe was not a signatory to any of these documents or a party to the Essex Superior Court Order.