IRENE GIUFFRIDA & others[1] *vs.* HIGH COUNTRY INVESTOR, INC., & others.[2]

No. 07-P-751.

Essex. March 18, 2008. - November 24, 2008.

Present: COHEN, TRAINOR, & MEADE, JJ.

*Contract,* Termination, Performance and breach. *Corporation,* Corporate successor liability. *Estoppel. Emotional Distress. Consumer Protection Act,* Businessman's claim, Standing, Availability of remedy, Unfair or deceptive act. *Libel and Slander. "Anti-SLAPP" Statute.*

In an action arising from a dispute whether the plaintiffs remained entitled to exercise dining and shopping privileges created under certain agreements negotiated during the sale of a restaurant and butcher shop in the 1980's, the judge did not err in granting summary judgment in favor of the defendants (the corporation that had purchased the restaurant and butcher shop in 1994 from the original buyer, and its chief financial officer) on the plaintiffs' contract-based claims, where the only contracts on which the plaintiffs relied were not binding on the defendants. [233-235]

This court declined to address a claim that was not supported by reasoned argument on appeal. [235]

In a civil action alleging intentional infliction of emotional distress, the evidence relied on by the plaintiffs did not establish either the requisite extreme and outrageous conduct on the part of the defendants or the required severe and objectively unendurable emotional distress on the part of the plaintiffs. [236]

In an action arising from a dispute whether the plaintiffs remained entitled to exercise dining and shopping privileges as third-party beneficiaries under certain agreements negotiated during the sale of a restaurant and butcher shop in the 1980's, the judge erred in granting summary judgment in favor of the defendant (the corporation that had purchased the restaurant and butcher shop in 1994 from the original buyer) on the plaintiffs' claim under G. L. c. 93A, § 11, where the question remained open whether the defendant, in seeking to conclude a lease with the plaintiffs, had given false assurances to the plaintiffs that the privileges would continue in the future, even though the defendant's later actions in terminating the privileges were contractually permitted. [236-241]

In a defamation action, the trial judge did not err in ruling that the defendant was entitled to summary judgment because her statements fell within the absolute litigation privilege. [242-243]

---

[1]Santina Primavera and Gina Noto.

[2]Dennis January and John R. Swansburg. (See note 7, *infra.*)

Plaintiffs who had pursued a partially successful motion under the "anti-SLAPP" statute, G. L. c. 231, § 59H, were entitled to an award of attorney's fees under the statute, appropriately adjusted to account for the plaintiffs' limited success. [243-244]

CIVIL ACTION commenced in the Superior Court Department on December 2, 2004.

A special motion to dismiss was heard by *Richard E. Welch, III*, J., and the case was heard by *Patrick J. Riley*, J., on motions for summary judgment and a renewed special motion to dismiss.

*Paul S. Samson* for the plaintiffs.

*John E. Coyne* for High Country Investor, Inc., & another.

COHEN, J. This case arises from a dispute whether the immediate family of the late Frank Giuffrida (Frank), founder of the Hilltop Steak House restaurant and butcher shop in Saugus (Hilltop), remains entitled to exercise dining and shopping privileges (the privileges) at Hilltop under agreements negotiated by Frank in the late 1980's when Hilltop was sold. The plaintiffs are Frank's widow, Irene Giuffrida (Irene), and their two daughters, Santina Primavera and Gina Noto. The defendants are High Country Investor, Inc. (High Country), which acquired Hilltop in 1994 by means of an asset purchase from the original buyer, and High Country's chief financial officer, Dennis January.

In or around September, 2004, High Country ceased to provide the privileges, claiming that the plaintiffs' legal entitlement to them had terminated. The plaintiffs filed this suit in December, 2004, alleging breach of contract and other claims. January counterclaimed against all three plaintiffs, alleging abuse of process, interference with an advantageous relationship, and defamation. The plaintiffs filed a special motion to dismiss January's counterclaims, pursuant to the "anti-SLAPP" statute, G. L. c. 231, § 59H, which was allowed in part by a judge of the Superior Court. However, the judge declined to award the plaintiffs any attorney's fees.

As a result of the partial allowance of the special motion to dismiss, all that remained of January's counterclaim were claims

against Irene for interference with an advantageous relationship and defamation. Eventually, a different judge allowed the parties' cross motions for summary judgment, thereby disposing of all of the plaintiffs' claims, as well as January's remaining claims against Irene. In conjunction with her summary judgment motion Irene also had requested dismissal of January's remaining claims by means of a renewed special motion to dismiss under the anti-SLAPP statute, which the judge declined to allow.

The plaintiffs now appeal from the allowance of the defendants' motion for summary judgment, from the denial of Irene's renewed special motion to dismiss, and the denial of the plaintiffs' request for attorney's fees under the anti-SLAPP statute. January cross-appeals from the allowance of summary judgment on his defamation claim against Irene.

I. *Summary judgment issues.* We begin with the parties' appeals from the judge's summary judgment rulings, leaving for later discussion the anti-SLAPP issues raised by the plaintiffs. The applicable standards are familiar. "Summary judgment is appropriate where there is no genuine issue of material fact, and when, viewing the evidence in the light most favorable to the nonmoving party, the moving party is entitled to judgment as a matter of law." *Gray* v. *Giroux*, 49 Mass. App. Ct. 436, 438 (2000). See Mass.R.Civ.P. 56(c), as amended, 436 Mass. 1404 (2002). "[A] party moving for summary judgment in a case in which the opposing party [has] the burden of proof at trial is entitled to summary judgment if he demonstrates, by reference to material described in [rule] 56 (c), unmet by countervailing materials, that the party opposing the motion has no reasonable expectation of proving an essential element of that party's case." *Kourouvacilis* v. *General Motors Corp.*, 410 Mass. 706, 716 (1991). "On review of summary judgment, we . . . consider the record and the legal principles involved without deference to the motion judge's reasoning." *Clean Harbors, Inc.* v. *John Hancock Life Ins. Co.*, 64 Mass. App. Ct. 347, 357 n.9 (2005). Our review is de novo. See *Matthews* v. *Ocean Spray Cranberries, Inc.*, 426 Mass. 122, 123 n.1 (1997).

A. *Plaintiffs' claims.* 1. *Facts.* Taken in the light most favorable to the plaintiffs, the evidence in the summary judgment

record relating to the plaintiffs' claims may be summarized as follows. In 1988, Frank sold the corporation that owned and operated Hilltop to a company owned by John Swansburg,[3] in accordance with a purchase and sale agreement dated December 23, 1987 (Swansburg P&S). The Swansburg P&S provided that Frank and the plaintiffs, as Frank's immediate family, "during all of their lifetimes shall at any and all times be entitled" to various privileges, at no cost to them, including unlimited meals and beverages at the restaurant and unlimited goods for personal consumption at the butcher shop, as well as "[t]reatment of the highest priority, courtesy and respect," including the ability to bypass any line in obtaining service.[4]

---

[3]Swansburg called his company "The Hilltop Steak House, Inc." To avoid confusion with the Hilltop restaurant and butcher shop, we refer to this entity simply as "Swansburg's company."

[4]The complete text of the privileges provision in the Swansburg P&S is as follows:

"13. *Certain Post Closing Covenants of Buyer.*

"(a) Buyer covenants and agrees that Seller and all members of his immediate family during all of their lifetimes shall at any and all times be entitled to the following at no charge:

"(i) Meals and beverages for their personal consumption of unlimited quantity, subject to reasonable limits based on barkeeper liability, at the restaurant, including the lounge, presently named The Hilltop Steak House and goods of unlimited quantity for their personal consumption at the store presently named The Hilltop Butcher Shop and at any additional Hilltop like restaurants and butchershops operated by Buyer, New Company or The Hilltop Group.

"(ii) Treatment of the highest priority, courtesy and respect when dining or otherwise entertaining or shopping at such restaurants and butcher shops, which shall include, without limitation, seating at the next available desirable table without waiting in line; a dedicated and marked parking space adjacent to the main entrance (in its present location at Hilltop Steak House); and service at such butcher shops without waiting in line.

"(b) Guests of Seller and Seller's family shall be entitled to the same privileges as Seller with respect to the Hilltop Steak House subject to such reasonable limits on frequency and quantity as Buyer may approve, such approval not to be unreasonably withheld.

"(c) Buyer agrees to use his best efforts to inform and educate the responsible employees so that they will recognize Seller and his immediate family without the need for identification, and will in any

The Swansburg sale did not include the land and building where Hilltop operated. The premises continued to be owned by The Ranch, Inc. (Ranch), a corporation formed by Frank. Pursuant to the terms of the Swansburg P&S, Ranch executed a lease of the premises to Swansburg's company (the Lease). The Lease included provisions substantially identical to those contained in the Swansburg P&S, whereby Swansburg's company, as tenant, covenanted to provide Frank and his immediate family, during their lifetimes, with dining and shopping privileges at Hilltop.[5] The Lease also contained an option for the tenant to buy the premises after Frank's death.

event devise some system so that the entitlement to the above benefits may be readily ascertained in any case by means of a plastic card or some other device."

[5]The complete text of the privileges provision in the Lease is as follows:

"16.20 LANDLORD'S MEALS AND GOODS

"(a) Tenant covenants and agrees that Giuffrida and all members of his immediate family during all of their lifetimes shall at any and all times be entitled to the following at no charge:

"(i) Meals and beverages of unlimited quantity, subject to reasonable limits based on barkeeper liability, at the restaurant, including the lounge, presently named The Hilltop Steak House and goods of unlimited quantity at the store presently named The Hilltop Butcher Shop and at any additional Hilltop-like restaurants and butchershops operated by Tenant or the Hilltop Group as defined in the Purchase and Sale Agreement.

"(ii) Treatment of the highest priority, courtesy and respect when dining or otherwise entertaining or shopping at such restaurants and butcher shops, which shall include, without limitation, seating at the next available desirable table without waiting in line; a dedicated and marked parking space adjacent to the main entrance (in its present location at Hilltop Steak House); and service at such butcher shops without waiting in line.

"(b) Guests of Giuffrida and Giuffrida's family shall be entitled to the same privileges as Giuffrida with respect to the Hilltop Steak House subject to such reasonable limits on frequency and quantity as Giuffrida [*sic*] may approve, such approval not to be unreasonably withheld.

"(c) Tenant agrees to use his best efforts to inform and educate the responsible employees so that they will recognize Giuffrida and his immediate family without the need for identification, and will in any event devise some system so that the entitlement to the above benefits may be readily ascertained in any case by means of a plastic card or some other such device."

In 1990, Ranch purchased a sublease of a portion of the premises on which an office building was located (the Sublease). In addition to executing the Sublease, Ranch and Swansburg also executed an amendment to the Lease, providing in part that the tenant's option to purchase the leased premises was subject to the rights and interest of Ranch under the Sublease.

In 1994, Swansburg's company sold certain assets, including Hilltop and associated trademarks, to defendant High Country, pursuant to an asset purchase agreement. In connection with this transaction, High Country entered into a trademark license agreement, whereby it expressly acknowledged that the restrictions on the use of the "Hilltop" and "Frank Giuffrida" names contained in the Swansburg P&S would remain in effect. High Country also received an assignment of the Lease, and assumed the tenant's obligations thereunder.

Frank died on December 31, 2003, at the age of 86. By letter dated January 27, 2004, High Country notified Ranch, now owned and controlled by the plaintiffs, of its intent to exercise the option to purchase contained in the Lease; however, the transaction did not go smoothly. Although High Country intended to close on March 8, 2004, with Ranch giving a deed to High Country, and High Country giving Ranch a new direct lease in substitution for the Sublease, Ranch's attorneys refused to go forward until several issues were resolved. They claimed that the new direct lease, which was supposed to contain the same terms as the Sublease, included "substantial modifications that increase Ranch's responsibilities and limit its rights and interests"; that a previously approved "ANR plan" (approval not required; see G. L. c. 41, § 81P) of the property needed to be recorded to ensure intended zoning rights for the subleased premises; and that there was a question whether High Country was in default and had lost its right to exercise the option because it had constructed an addition to Hilltop without Ranch's consent. High Country's attorney responded by accusing Ranch of raising these roadblocks in bad faith, claiming that Ranch's real concern was that it was disadvantageous to Ranch from a tax standpoint for High Country to exercise the option in 2004.

On or about March 16, 2004, January contacted John Giovannini, a nonlawyer employed by Ranch, who served as the

plaintiffs' representative in their business affairs. January told Giovannini that Richard Monfort, High Country's principal, was very unhappy with the plaintiffs and that if they were unable to close the sale of the real estate to High Country by March 31, 2004, January was instructed to bring suit and make it more difficult for the plaintiffs to exercise their privileges. Giovannini requested that January go through counsel, but January refused. Fearing that January would follow through on his threat, Giovannini, after consulting with Irene, engaged in direct discussions with January.

The privileges were of considerable importance to the plaintiffs. From the time that Frank first sold Hilltop, it had meant a great deal to the family to be treated as they had been when they were the owners. It may be inferred from their long relationship with the Giuffrida family that Monfort and January well understood the plaintiffs' strong feelings about the privileges. Monfort, a Colorado businessman, had supplied beef to Frank and later to Swansburg. He had known the Giuffrida family for approximately twenty-five years and had visited their home. January, an officer of High Country, was based in Saugus and had managed Hilltop since 1995. Both men were aware that it was important to the Giuffridas not to be treated like ordinary customers and that, for example, they did not wish to go through the cash register, even if they would not be charged.

The plaintiffs considered the privileges to be part of Frank's "legacy" to them and that they were "etched in stone" for their lifetimes, as Frank had assured them. Giovannini also was under the impression that the privileges would continue for the plaintiffs' lifetimes and would be unaffected if the real estate changed hands. Monfort, on the other hand, always was of the view that once the Lease terminated, the plaintiffs would lose their privileges.

In or around March 20, 2004, the parties began to explore a buyout of the Sublease by High Country in conjunction with the exercise of its option on the premises. January led Giovannini to believe that buying out the Sublease was necessary in order to obtain financing, but it is unclear whether that was the case.[6] Regardless, from January's perspective, buying out the Sublease

---

[6] In anticipation of the original deal, which simply substituted a direct lease for the Sublease, High Country already had obtained financing and closed

was "a good business decision" for High Country, because, as he explained at his deposition, doing so would "eliminate basically having anything to do with any prior agreement with the Giuffrida family or the Ranch or anything else and that would leave us free and have the property clear and free."

The major obstacle to reaching agreement about the Sublease was a dispute over the purchase price. However, on a number of occasions between March 16 and March 25, 2004, January brought up the subject of the privileges during negotiations. January told Giovannini that High Country would make it difficult for the plaintiffs to exercise the privileges if they did not agree to sell the optioned premises and the Sublease to High Country. He also informed Giovannini that they wanted to treat Irene with respect and did not want to interfere with the privileges — that "basically he wanted to let [the privileges] continue as they were presently." Giovannini acknowledged to January that Irene did not "want anything to interfere with the shopping and dining privileges." He understood January to be saying, on behalf of Monfort, that the privileges would remain unchanged upon the successful completion of the real estate transfer.

On March 25, 2004, January, Giovannini, and Irene had a telephone conversation in which January stated a final time that High Country would make it difficult for the plaintiffs to exercise the privileges if the closing did not go through. Following a conversation between Irene and one of her daughters, plaintiff Gina Noto, Irene decided to accept High Country's offer of $500,000 to purchase the Sublease "in order to avoid any interference with the . . . [p]rivileges." She did so even though the offer was $200,000 less than a previous offer made by High Country.

On March 30, 2004, Ranch (by Primavera, as president, and Noto, as treasurer) deeded the premises to High Country and executed both a "Termination of Lease" and a "Termination of Sublease." The plaintiffs did nothing to formally preserve the privileges prior to the closing, because they believed they were "etched in stone," as they had been told by Frank.

For five and one-half months after the closing, High Country

with its lender, with the money placed in escrow pending a closing with Ranch.

continued to honor the privileges. Then, on September 14, 2004, High Country sent Ranch a letter stating: "It has come to our attention that upon the 'closing' on the sale of the Hilltop, including the termination of the lease agreement, the shopping and dinning [sic] privileges for the Giuffrida family no longer exist. [T]his ends the free shopping and dinning [sic] privileges of the Giuffrida family."

2. *Discussion.* The motion judge granted summary judgment to defendants High Country and January on all live claims contained in the plaintiffs' amended complaint:[7] Count I, breach of contract (both defendants); Count II, breach of the duty of good faith and fair dealing (both defendants); Count III, estoppel (both defendants); Count IV, intentional interference with advantageous contractual relations (both defendants); Count V, intentional infliction of emotional distress (both defendants); Count VII, seeking termination of trademark rights by reason of breach of the Swansburg P&S (High Country); and Count VIII, violation of G. L. c. 93A (High Country). With the exception of the c. 93A claim, we agree that the defendants were entitled to summary judgment.

a. *Contract-based claims.* Counts I, II, IV, and VII all depend upon the existence of a contractual obligation on the part of High Country to provide continuing privileges to the plaintiffs. However, the only contracts upon which the plaintiffs rely, the Lease and the Swansburg P&S, are not binding upon High Country.[8]

Insofar as the Lease is concerned, High Country's covenant to provide the privileges terminated along with the Lease, when Noto and Primavera signed the Notice of Termination on behalf of Ranch. Furthermore, the Lease itself terminated by operation of law, because High Country's acquisition of Ranch's title to the land effected "a union of the greater and the lesser estate in

---

[7]Originally, there was an additional claim (Count VI), brought against John Swansburg, but it was dismissed for failure to make service and is not at issue in this appeal.

[8]Although they are not direct parties to either agreement, the plaintiffs rely upon their status as third-party beneficiaries in seeking to enforce them. The plaintiffs do not contend that a new contract to provide the privileges was formed in conjunction with the sale of the premises. It was and remains their position that no new agreement was required.

the same person and in the same right." See *Hurley* v. *A'Hearn*, 338 Mass. 695, 697 (1959).[9]

Insofar as the Swansburg P&S is concerned, because High Country acquired Hilltop by means of an asset purchase, it did not automatically succeed to the obligations of Swansburg's company. "[T]he liabilities of a selling predecessor corporation are not imposed on the successor corporation which purchases its assets unless (1) the successor expressly or impliedly assumes liability of the predecessor, (2) the transaction is a de facto merger or consolidation, (3) the successor is a mere continuation of the predecessor, or (4) the transaction is a fraudulent effort to avoid liabilities of the predecessor." *Cargill, Inc.* v. *Beaver Coal & Oil Co.*, 424 Mass. 356, 359 (1997).[10] Here, none of these exceptions is applicable.

Even if High Country can be said to have assumed other liabilities of Swansburg's company under the Swansburg P&S, they were limited to those associated with the use of the "Hilltop" and "Giuffrida" trademarks.[11] The record contains no evidence from which it could be inferred that High Country impliedly assumed liability for the privileges.[12] See *Aldrich* v. *ADD Inc.*, 437 Mass. 213, 218 (2002). Nor is there any evidence (or any

---

[9]To the extent the plaintiffs suggest that, despite the termination of the Lease, the privileges provision continued to bind High Country as possessor of the premises, the argument fails for at least two reasons: (1) the plaintiffs have not alleged the separate theory of breach of a real covenant, see *Clark* v. *Mead Realty Group, Inc.*, 67 Mass. App. Ct. 491, 498 (2006); and (2) the privileges provision does not "touch and concern" the land, see *Whitinsville Plaza, Inc.* v. *Kotseas*, 378 Mass. 85, 90 (1979).

[10]Contrary to the plaintiffs' position, this principle is not restricted to tort liability; it also applies to contractual liability. See *Fox* v. *F & J Gattozzi Corp.*, 41 Mass. App. Ct. 581, 591 (1996).

[11]The trademark license agreement provides:

"Licensor acknowledges and agrees to abide by certain restrictions on the use of the 'Hilltop' and 'Frank Giuffrida' names contained in a certain Purchase and Sale Agreement by and between Frank J. Giuffrida, John R. Swansburg, and The Ranch, Inc., dated as of December 23, 1987, a copy of which restrictions are attached hereto as Exhibit A."

[12]There is no merit to the plaintiffs' contention that the physical proximity of the trademark restrictions and the privileges terms in the Swansburg P&S gives rise to an inference that these provisions were linked. Because these are separate and independent provisions, the express assumption by High Country

argument) that the asset purchase was a de facto merger, that High Country was a mere continuation of Swansburg's company, or that the transaction was a fraudulent effort to avoid Swansburg's company's debts.[13]

b. *Estoppel.* As a general proposition, "[c]ircumstances that may give rise to an estoppel are (1) a representation intended to induce reliance on the part of a person to whom the representation is made; (2) an act or omission by that person in reasonable reliance on the representation; and (3) detriment as a consequence of the act or omission." *Cannon* v. *Cannon,* 69 Mass. App. Ct. 414, 422 (2007), quoting from *Bongaards* v. *Millen,* 440 Mass. 10, 15 (2003). Here, the asserted basis for the plaintiffs' estoppel claim is that the defendants knowingly misrepresented their intentions in promising that they would not interfere with the exercise of the plaintiffs' privileges if the plaintiffs agreed not to pursue the assertion that High Country had defaulted on certain provisions of the Lease or to press for a higher valuation of certain development rights and of one of the structures on the property. The motion judge ruled that the plaintiffs lacked standing to press this claim, because the only party that acted in reliance upon the defendants' statements was Ranch, as the owner of the property.

On appeal, the plaintiffs' argument consists only of an abstract, abbreviated summary of the legal elements of equitable estoppel and promissory estoppel. They offer no reasoned explanation why they, as individuals, may be said to have relied upon the misrepresentations in question; nor do they contend that Ranch's reliance permits them, as individuals, to assert an estoppel claim, as third-party beneficiaries or otherwise. We therefore address the issue no further.[14] See Mass.R.A.P. 16(a)(4), as amended, 367 Mass. 921 (1975).

---

of the trademark restrictions is not indicative of an implied assumption of the obligation to provide the privileges; nor is High Country's failure to honor the privileges a breach of its unrelated and independent agreement to abide by the trademark restrictions. Accordingly, High Country was entitled to summary judgment on Count VII, for termination of its trademark rights based upon its failure to provide the privileges.

[13]Although we reach the same result, we do not adopt the motion judge's analysis with regard to the Swansburg P&S. He viewed the Swansburg P&S and the Lease as interrelated, such that the termination of the Lease also terminated the privileges provision in the Swansburg P&S.

[14]We also decline to consider another of the plaintiffs' contentions, i.e., that

c. *Intentional infliction of emotional distress.* To prevail on a claim for intentional infliction of emotional distress, a plaintiff must establish: "(1) that the actor intended to inflict emotional distress or that he knew or should have known that emotional distress was the likely result of his conduct . . . ; (2) that the conduct was 'extreme and outrageous,' was 'beyond all possible bounds of decency' and was 'utterly intolerable in a civilized community' . . . ; (3) that the actions of the defendant were the cause of the plaintiff's distress . . . ; and (4) that the emotional distress sustained by the plaintiff was 'severe' and of a nature 'that no reasonable man could be expected to endure it.' " *Agis* v. *Howard Johnson Co.*, 371 Mass. 140, 144-145 (1976). As the motion judge correctly ruled, the plaintiffs' claims fail for at least two reasons. The conduct relied upon by the plaintiffs — January's negotiating tactics coupled with the eventual repudiation of the privileges by High Country — does not rise to the level required to establish this cause of action, as matter of law. See *Sena* v. *Commonwealth*, 417 Mass. 250, 264 (1994); *Tetrault* v. *Mahoney, Hawkes & Goldings*, 425 Mass. 456, 466 (1997); *Conley* v. *Romeri*, 60 Mass. App. Ct. 799, 804-805 (2004). Furthermore, what little proof there is that the plaintiffs were upset by this conduct does not support a finding that they suffered severe and objectively unendurable emotional distress.

d. *Chapter 93A claim.* We turn now to consideration of the plaintiffs' c. 93A claim, which they assert solely against High Country. The motion judge ruled that no reasonable fact finder could conclude that the conduct upon which the plaintiffs rely was unfair or deceptive. We think, however, that viewed in the light most favorable to the plaintiffs, the evidence contained in the summary judgment record suffices to create an issue for trial.

As a threshold matter, we must consider whether the plaintiffs'

---

they are entitled to obtain reformation of the agreement between Ranch and High Country on the grounds of mutual or unilateral mistake as to the continued existence of the privileges after termination of the Lease. The plaintiffs asserted no such claim in their amended complaint, nor have they offered any reasoned argument why they, as individuals, should be permitted to bring a claim for reformation of an agreement to which they were not a party.

c. 93A claim arises under § 9 or § 11, as relief under these sections is mutually exclusive. Section 11 permits suit by

> "[a]ny person who engages in the conduct of any trade or commerce and who suffers any loss of money or property, real or personal, as a result of the use or employment by another person who engages in any trade or commerce of an unfair method of competition or an unfair or deceptive act . . . ."

G. L. c. 93A, § 11, inserted by St. 1972, c. 614, § 2. Section 9 defines those entitled to relief as

> "[a]ny person, *other than a person entitled to bring an action under section eleven of this chapter,* who has been injured by another person's use or employment of any method, act or practice declared to be unlawful [under § 2] . . ." (emphasis added).

G. L. c. 93A, § 9, as amended through St. 1979, c. 406, § 1.

Regardless of the fact that the plaintiffs sent High Country a demand letter asserting a claim under § 9, we think the claim is properly viewed as arising under § 11. The negotiations concerning the exercise of High Country's option and the eventual termination of the Lease and sale of the Sublease were acts undertaken by the plaintiffs primarily to further business objectives, i.e., to resolve Ranch's obligations under the Lease and to sell commercial real estate belonging to Ranch. See *Frullo* v. *Landenberger,* 61 Mass. App. Ct. 814, 821 (2004). Thus, because the plaintiffs were motivated by business considerations, their claim is one under § 11, even though their personal interests in the privileges also were implicated. *Ibid.*

That is not to say, however, that the plaintiffs lack standing to pursue a c. 93A claim. To the contrary, as required by § 11, they are persons who have suffered a loss of money or property — the termination of their enforceable right to complimentary dining and shopping as third-party beneficiaries of High Country's covenant with Ranch — as a result of alleged unfair or deceptive acts of High Country. This claim belongs to and is enforceable by the plaintiffs; they assert no claim based upon losses sustained by Ranch, notwithstanding the fact that, in order

to preserve their privileges, the plaintiffs, acting on behalf of Ranch, accepted a $200,000 reduction in the purchase price for the Sublease. Contrast *Schaeffer* v. *Cohen, Rosenthal, Price, Mirkin, Jennings & Berg, P.C.*, 405 Mass. 506, 514 (1989) (plaintiff, former shareholder of closely held corporation, could not assert § 11 claim against corporation's attorneys where it was corporation that sustained loss of money or property as a result of alleged unfair or deceptive acts or practices, and plaintiff proved no other personal losses).

The plaintiffs may maintain their c. 93A claim even though High Country dealt with the plaintiffs as officers and shareholders of Ranch. See *Standard Register Co.* v. *Bolton-Emerson, Inc.*, 38 Mass. App. Ct. 545, 551 (1995); *Reisman* v. *KPMG Peat Marwick LLP*, 57 Mass. App. Ct. 100, 125a (2003). Privity is not required to maintain an action under c. 93A, § 11, "so long as the parties are engaged in more than a minor or insignificant business relationship." *Standard Register Co.* v. *Bolton-Emerson, Inc., supra.* Here, where the plaintiffs directly engaged in a month-long negotiation with High Country for the sale of commercial property, and had been the corporate officers and shareholders of High Country's landlord (Ranch) for many years, the business relationship between the parties was "more than . . . minor or insignificant." *Ibid.* Contrast *Imprimis Investors, LLC* v. *KPMG Peat Marwick LLP*, 69 Mass. App. Ct. 218, 231 (2007).

Having concluded that the plaintiffs' claim is properly viewed as arising under § 11, and that they have standing to assert it, the question remains whether the conduct upon which they rely suffices to make out a violation of the statute. "In a G. L. c. 93A claim, the existence of unfair or deceptive acts ordinarily must be determined from the circumstances of each claim." *Marram* v. *Kobrick Offshore Fund, Ltd.*, 442 Mass. 43, 61 (2004). One of the circumstances we consider is whether the claim arises under § 9 or § 11. "[B]usinesses seeking relief under Section 11 are held to a stricter standard than consumers in terms of what constitutes unfair or deceptive conduct." Chapter 93A Rights & Remedies § 2.5, at 2-67 (Mass. Cont. Legal Educ. 2d ed. 2007). Nevertheless, "[e]ven in vigorous competition among business concerns, misrepresentations may be so seriously

deceptive and harmful as to permit some recovery for the injury really caused by them. Indeed, in some circumstances, even half-truths may constitute serious deception. . . . Business strategy 'in the rough and tumble of the world of commerce' should not use conscious misrepresentation as a competitive weapon." *Zayre Corp.* v. *Computer Sys. of Am., Inc.*, 24 Mass. App. Ct. 559, 570 n.23 (1987) (*Zayre*).

Particularly instructive is *Zayre, supra*, in which Justice Cutter explained that a party may be found liable under c. 93A, § 11, for having given false assurances as to future conduct, even though the party's later actions, taken contrary to those assurances, were contractually permitted. In *Zayre*, Computer Systems of America (CSA) had leased computer equipment to Zayre, which, in turn, subleased the equipment to Comdisco, Inc. (Comdisco), with CSA's permission. Shortly thereafter, Comdisco arranged for Zayre to terminate the lease under a clause allowing termination if the equipment became "obsolete or surplus." *Id.* at 567. CSA claimed that Comdisco had violated c. 93A by representing to CSA during the sublease negotiations that Comdisco would further sublease the equipment to other end users for the remaining term, despite the fact that Comdisco always intended to have Zayre terminate the lease as soon as it was able. Even though it was questionable whether CSA's consent to the sublease was required and even though Zayre had a contractual right to terminate the lease, this court opined that it was open to the trier of fact to determine that Comdisco's conduct was a violation of c. 93A, § 11.[15] The court observed that even if CSA's consent was unnecessary, by withholding that consent (which was procured through misrepresentations), "CSA at least could have delayed or forced revision" of the purchase agreement that ultimately harmed Zayre by effecting the termination of its own rental agreement. *Zayre, supra* at 570 & n.22.

By analogy, in the present case, we think it open to a trier of fact to find that High Country violated c. 93A by representing to the plaintiffs that the privileges would remain undisturbed if

---

[15]Of course, the existence of a triable issue does not guarantee that the claimant will prevail. In *Zayre*, the trial judge found, as a matter of fact, that Comdisco's assurances to CSA were not sufficiently deceptive to give rise to recovery, and that decision was affirmed on appeal. *Zayre, supra* at 571.

they proceeded to close, while actually intending that the privileges terminate after the deal concluded. This finding may be made even though there is a question whether the plaintiffs had the right to avoid High Country's exercise of the option and the termination of the lease, and even though High Country was not contractually obliged to continue the privileges once the Lease terminated. For example, as noted earlier, the Lease, as amended, provided that the tenant's option to purchase the leased premises was subject to the rights and interest of Ranch under the Sublease. Had they not been misled by High Country's misrepresentation, the plaintiffs might have exerted leverage similar to that posited in *Zayre, supra.*

A trier of fact could find that High Country knew that its March, 2004, transaction with the plaintiffs would result in the termination of its obligation to provide the privileges, as Monfort had always been of the view that the privileges would end along with the Lease, and January believed that completion of the deal would, in his words, "eliminate basically having anything to do with any prior agreement with the Giuffrida family." Nevertheless, commencing on March 16, 2004, January, claiming to be conveying instructions from Monfort, represented to the plaintiffs, via Giovannini and later Irene, that if they were unable to close the sale of the real estate by March 31, 2004, High Country would make it more difficult for the plaintiffs to exercise their privileges — despite a stated desire to treat Irene with respect and let the privileges continue as they existed. A fact finder could infer that January's statements were intended to be understood by Giovannini and the plaintiffs as an assurance that, if the plaintiffs agreed to a prompt closing, the privileges would continue as before, and that the plaintiffs, in fact, understood them in that way.

While it may have behooved the plaintiffs to have confirmed with their attorneys their assumption that the privileges obligation would continue after the termination of the Lease, a fact finder also could determine that High Country's assurances lulled the plaintiffs into assuming that there was no need to do so, particularly given the evidence that January refused to conduct the March negotiations through counsel. In any event, "[r]easonable

reliance . . . is not necessarily a prerequisite of recovery under G. L. c. 93A, § 11." *Zayre*, 24 Mass. App. Ct. at 570.[16]

In short, summary judgment should not have been granted on the plaintiffs' c. 93A claim.

B. *Summary judgment on January's counterclaim.* We now consider January's cross appeal. The motion judge allowed Irene's motion as to the two live claims against her — interference with an advantageous relationship and defamation. On appeal, January confines his appellate argument to his defamation claim.

1. *Facts.* Taken in the light most favorable to January, the evidence bearing on the defamation claim is as follows. On September 14, 2004, January wrote to Ranch stating that the privileges were ended by the sale of the Saugus real estate to High Country and resulting termination of the Lease. On September 29, 2004, Ranch's counsel responded, demanding that the purported cancellation of the privileges be reinstated or litigation would ensue. Among the claims asserted in this letter was one based upon January's alleged misrepresentations and inducements (also characterized in the letter as "coercion or threat"). Monfort replied to Ranch's counsel in a letter dated October 11, 2004, reiterating that the privileges had ceased. He also wrote, "We want to treat Irene and the girls with the respect they deserve, and they will always be very special guests. We would entertain discussing how best to do that, but don't feel we need a law firm to do that." Monfort sent copies of this letter directly to Irene, Noto, and Primavera.

Irene responded personally to Monfort in an undated letter, stating that she, too, would like to settle the matter, but would like to do so through her lawyer. She then articulated her position with respect to the privileges and stated her intention to pursue "all [her] other remedies" unless the matter were resolved

---

[16]To be sure, the plaintiffs cannot prevail on their § 11 claim unless they establish that they suffered a loss of money or property (the termination of their enforceable right to complimentary dining and shopping privileges as third-party beneficiaries of High Country's covenant with Ranch) *as a result of* a c. 93A violation by High Country. See, e.g., *Frullo* v. *Landenberger*, 61 Mass. App. Ct. at 822-823. On the record before us, however, it cannot be determined as matter of law that the plaintiffs had no means of delaying or avoiding the extinction of the privileges. See discussion, *supra.*

in a quick and amicable fashion. Irene's letter then continued: "On another issue, I felt that Dennis January did not handle this whole matter with respect for the Giuffrida family. In your letter you stated that you have, 'always treated my family with respect because we deserve it.' Well let me tell you, Dennis January did the opposite by bullying and threatening me. During our closing negotiations in March 04, Dennis made the comment to both myself and John Giovannini that if we do not close by March 31, 2004 that he would make my lifetime rights difficult to exercise." January's defamation claim is based upon these statements about him.

After receiving Irene's letter, Monfort called January and told him about it. As averred in January's affidavit, January felt "outraged and angry," and suffered emotional distress, sleeplessness, nausea, and concern for his job. Irene's accusations affected his ability to focus on his work and left him agitated. He "found [Irene's] personal attack on [his] integrity devastating."

2. *Discussion.* The motion judge ruled that Irene was entitled to summary judgment because her statements were privileged. January's only argument, made in a single paragraph, is that the case relied upon by the judge, *Sriberg* v. *Raymond*, 370 Mass. 105, 106 (1976), relates only to prelitigation communications by a party's attorney and does not apply where a party has made the statements at issue.

January's position is without merit. Although *Sriberg*, itself, concerned a demand letter by an attorney, it is well-established that communications by a party preliminary to a proposed judicial proceeding also are entitled to protection, provided that legal action was contemplated when the allegedly defamatory statements were made. See, e.g., *id.* at 108 ("[w]e have hitherto held that statements by a party . . . in the institution of . . . a judicial proceeding are absolutely privileged provided such statements relate to that proceeding"); *Correllas* v. *Viveiros*, 410 Mass. 314, 321-322 (1991). See also Restatement (Second) of Torts § 587 (1977). Whether an absolute privilege applies to such communications is determined on a case-by-case basis, after a fact-specific analysis. *Correllas* v. *Viveiros, supra* at 323. See *Fisher* v. *Lint,* 69 Mass. App. Ct. 360, 365-366 (2007). Here, the undisputed facts fully support the application of the privilege.

At the time Irene wrote her letter, counsel for Ranch already had communicated, and Irene was reiterating, her intention to pursue litigation if the privileges were not restored. Furthermore, the bases for such litigation included January's conduct during the parties' negotiations. Because legal action was contemplated when the allegedly defamatory statements about January were made, these statements were within the absolute litigation privilege.

II. *Anti-SLAPP issues.* In view of the fact that Irene obtained summary judgment on January's claims against her for interference with an advantageous relationship and defamation, her argument that she was entitled to dismissal of these claims under the anti-SLAPP statute is largely academic. Nevertheless, because resolution of the issue bears on the plaintiffs' claim for attorney's fees under the anti-SLAPP statute (see discussion *infra*), we consider it.

Irene's renewed special motion to dismiss was in the nature of a request for reconsideration and was not procedurally defective.[17] Her argument, in essence, is that her letter notifying the defendant of intent to take legal action falls within the anti-SLAPP statute as a "written or oral statement made in connection with an issue under consideration or review by a legislative, executive, or judicial body, or any other governmental proceeding." G. L. c. 231, § 59H, inserted by St. 1994, c. 283, § 1. However, at the time she sent her letter, the issues in question were not "under consideration" in any governmental proceeding. Contrast *Plante* v. *Wylie*, 63 Mass. App. Ct. 151, 159 (2005) (settlement demand made to resolve disputed issue under review by planning board was made "in connection with" pending governmental proceeding). While there are important reasons to afford legal protection to prelitigation demand letters, as recognized by the existence of the litigation privilege discussed above, the anti-SLAPP statute does not, in terms, provide additional protection for such communications. See *Kobrin* v. *Gastfriend*, 443 Mass. 327, 340-341 (2005) (anti-SLAPP inquiry and litigation privilege inquiry are distinct).

---

[17]There is no merit to January's argument that Irene could only challenge the original ruling by appealing it. The power to reconsider an issue remains in the trial court until final judgment. *Riley* v. *Presnell*, 409 Mass. 239, 242 (1991).

We agree with the plaintiffs, however, that even though their original special motion to dismiss was only partially successful (upon Count I, abuse of process, as to all the plaintiffs, and upon Counts II and III, interference with an advantageous relationship and defamation, as to Noto and Primavera), they were entitled to an award of attorney's fees under the statute. Such an award is mandatory. See *Wenger* v. *Aceto*, 451 Mass. 1, 9 n.10 (2008). See also *Office One, Inc.* v. *Lopez*, 437 Mass. 113, 126 (2002). The moving party need not prevail on all counts to qualify for an award. See *Wenger* v. *Aceto, supra.* As in other fee award situations, however, the judge may make an appropriate adjustment to account for the prevailing party's limited success. See *Guardianship of Hurley*, 394 Mass. 554, 561 (1985), citing *Hensley* v. *Eckerhart*, 461 U.S. 424, 435 (1983).

III. *Conclusion.* The order denying plaintiff Irene Giuffrida's renewed special motion to dismiss under G. L. c. 231, § 59H, is affirmed. The order denying the plaintiffs' motion for attorney's fees pursuant to G. L. c. 231, § 59H, is reversed as to the claims on which they were successful.[18] The judgment on the plaintiffs' complaint is reversed as to Count VIII, G. L. c. 93A; in all other respects the judgment is affirmed. The judgment on January's counterclaim against Irene Giuffrida is affirmed. The case is remanded to the Superior Court for further proceedings consistent with this opinion.

*So ordered.*

---

[18]The plaintiffs' request for appellate attorney's fees pursuant to G. L. c. 231, § 59H, is allowed as to the counts on which they were successful. See *Wenger* v. *Aceto*, 451 Mass. at 9 n.10. They may make such application to this court in accordance with the procedure set forth in *Fabre* v. *Walton*, 441 Mass. 9, 10-11 (2004).