**Janet BAKER and James Baker, Plaintiffs**

v.

**GOLDMAN SACHS & CO., et al., Defendants.**

**Robert Roth and Paul G. Bamberg, Plaintiffs**

v.

**Goldman Sachs & Co., Defendant and Third–Party Plaintiff,**

v.

**Janet Baker and James Baker, Third–Party Defendants.**

Civil Action Nos. 09–10053–PBS, 10–10932–PBS.

United States District Court, D. Massachusetts.

June 11, 2013.

---

Terence K. Ankner, The Law offices of Partridge, Ankner & Horstmann, LLP, Jennifer S. Behr, Catherine C. Deneke Foley, Jeffrey S. Follett, Christian M. Hoffman, Jack R. Pirozzolo, Amy Senier, Foley Hoag LLP, Michael J. Howe, Matthew L. McGinnis, Ropes & Gray LLP, Boston, MA, Debra A. Djupman, Reed Smith LLP, Philadelphia, PA, Carrie M. Reilly, Lindsey M. Weiss, Wachtell, Lipton, Rosen & Katz, New York, NY, Andrew J. Soven, Reed Smith LLP, Philadelphia, PA, for Plaintiffs.

Alan K. Cotler, Joan A. Yue, Reed Smith, LLP, Philadelphia, PA, John D. Donovan, Jr., Daniel V. McCaughey, Annmarie A. Tenn, Ropes & Gray LLP, Katie M. Perry, Foley Hoag LLP, Boston, MA, Shannon Elise McClure, Michael T. Scott, Steven T. Voigt, Reed Smith LLP, Philadelphia, PA, for Defendants.

### *MEMORANDUM AND ORDER*

SARIS, Chief Judge.

## I. INTRODUCTION

On June 7, 2000, Dragon Systems, Inc. ("Dragon"), a company that revolutionized

speech recognition technology, merged into Lernout & Hauspie Speech Products N.V. ("L & H"). Within months, the public disclosure of a fraud at L & H rendered its stock worthless. Plaintiffs Janet and James Baker, Robert Roth, and Paul Bamberg, the founders and principal shareholders of Dragon, lost about $300 million as well as their lives' work, and spent the next decade in litigation against L & H and others trying to claim back the losses.

Janet and James Baker, wife and husband founders and controlling shareholders of Dragon, filed a complaint asserting breach of contract, negligent and intentional misrepresentation, negligence, gross negligence, breach of fiduciary duty, and violations of ch. 93A against their investment banker, Defendant Goldman Sachs & Co. ("Goldman"). This lawsuit was consolidated with a similar action later filed by Roth and Bamberg, the other principal shareholders.[1] On January 23, 2013, after a 20–day trial, the jury found in favor of Goldman on all the plaintiffs' remaining common law claims: negligent performance of services, gross negligence, intentional misrepresentation, negligent misrepresentation, and the Bakers' breach of fiduciary duty claims. Although the instructions told them to reach the third-party claims only if liability against Goldman was found, the jury also found that Janet Baker made negligent misrepresentations to Bamberg and Roth and breached her fiduciary duty to them, and that James Baker breached his fiduciary duty to Paul Bamberg.

The plaintiffs allege Goldman violated the Massachusetts Unfair Trade Practices statute, Mass. Gen. Laws ch. 93A, because it was egregiously negligent and made fraudulent statements when it advised Dragon to merge with L & H without engaging in adequate financial due diligence. After consideration of the evidence presented at trial, the jury's verdict, and the arguments advanced by counsel, the Court finds in favor of Goldman.[2]

## II. FINDINGS OF FACT

The Court makes the following findings of fact based on the evidence introduced at trial.

## A. *The Golden Eggs*

Plaintiffs revolutionized speech recognition technology based upon a mathematical model for computer speech recognition developed by James Baker in his Ph.D. thesis. Founding Dragon in 1982, they created software that not only recognized spoken commands, but also enabled the dictation and transcription of natural conversational speech. Dragon began as a four-person company operating out of the Bakers' living room, growing into a closely held corporation, headquartered in Newton, Massachusetts and valued in 2000 at approximately $600 million. In 1994, Seagate Technologies, Inc. became a minority investor in Dragon. The Bakers remained the majority shareholders. Roth and Bamberg remained principal shareholders

---

1. James Baker, Roth, and Bamberg's breach of contract claims were dismissed before trial. Roth and Bamberg's breach of fiduciary duty claims were also dismissed before trial. Janet Baker's third-party beneficiary breach of contract claim was voluntarily dismissed during trial.

2. After the start of trial, the litigation strategies of counsel for the Bakers and counsel for

Roth and Bamberg began to diverge. At first, the conflict was primarily about the amount of trial time spent for various witnesses. In response, the Court gave Roth and Bamberg additional time. After the jury verdict, a more substantive conflict emerged when Roth and Bamberg began asserting claims against the Bakers.

and were, at various times, members of Dragon's Board of Directors and senior management.

In 1997, Dragon released Dragon NaturallySpeaking, a continuous speech and voice recognition software program for general purpose use with a vocabulary of over 20,000 words. By the end of 1998, Dragon was a leader in speech technology products, had a strong portfolio of patents, and had garnered more than 100 industry awards worldwide. During this time, Dragon had an extensive research and development pipeline for future products and opportunities—Dragon's "golden eggs"— which included speech recognition for mobile telephones and handheld devices. In order to effectively develop this technology, Dragon needed additional capital and began to consider a merger with another company.

Although Dragon was recognized as a technology leader, the company had been losing money every year, except for 1998 due to increased sales of Dragon NaturallySpeaking. The primary reason Dragon had been losing money was because it was too dependent on selling its software in the retail market, which accounted for about 85 percent of Dragon's revenue. Dragon needed a revenue stream to continue to develop its "golden eggs."

Janet Baker was CEO of Dragon from 1998 until October 5, 1999, when she was asked by Seagate to resign during a Dragon Board meeting. When she was in charge, she was considered difficult to work with. According to Dragon President John Shagoury, she was viewed as having unrealistic views of how Dragon should be valued and how pricing should be done. During this time, Dragon employees were concerned about the company's ability to make payroll. At the October 5, 1999 meeting, Shagoury stated that Dragon will "have to have layoffs if we can't find a suitable partner. I'm concerned about the fragility of key people in the next 90 days." Tr. 27:5–7, Dec. 19, 2013. Don Waite of Seagate was subsequently appointed as Dragon's new interim CEO.

## B. *Goldman Sachs*

Plaintiffs may have been brilliant mathematicians and scientists, but they had no financial experience with mergers and acquisitions. In the fall of 1999, Dragon received unsolicited offers to be acquired by L & H and Visteon Automotive Systems ("Visteon"), a subsidiary of Ford. Both offers valued Dragon at about $580 million and required Dragon stockholders to exchange their shares in Dragon for shares of the acquiring company and some cash. After these proposals were made, in November 1999, Goldman became Dragon's investment banker.

On December 8, 1999, Ellen Chamberlain, Dragon's Chief Financial Officer, signed an Engagement Agreement which stated that Goldman would provide "financial advice and assistance in connection with this potential transaction, which may include performing valuation analyses, searching for a[n acceptable] purchaser, coordinating visits of potential purchasers and assisting . . . in negotiating the financial aspects of the transaction." Ex. 783 at BAKE004457. The advice to be provided was "for the information of the Board of Directors and senior management." *Id.* at BAKE004460. Pursuant to the fee arrangement, Goldman would receive $5 million if it helped negotiate a successful transaction.

Goldman assembled a group of four people to work on the transaction—three investment bankers (T. Otey Smith, Alexander Berzofsky, and Richard Wayner) and one technology strategist (Christopher Fine). Smith was a 21 year old banker

who just graduated from college. Berzofsky, 25 years old, was actively pursuing other employment opportunities during the Dragon assignment. Fine focused largely on the technology aspects of the deal. Wayner, 31 years old, was the leader of the team. No senior Goldman Sachs investment banker did any work on the Dragon transaction.

On December 16 and 17, 1999, the plaintiffs, and other senior Dragon management, met with members of the Goldman team to have initial discussions regarding the proposals from L & H and Visteon. At these initial meetings, some plaintiffs, especially Bamberg, expressed strong reservations about merging with L & H, which they viewed as a competitor, and voiced strong concerns about their employee practices. On December 20, Goldman met again with the plaintiffs and Dragon Board of Directors. At the meeting, the Dragon Board agreed to enter into a period of exclusivity with Visteon. On February 7, 2000, Visteon terminated its letter of intent. Shortly after the demise of the Visteon deal, Dragon decided to pursue acquisition discussions with L & H.

## C. *Drive–and–Analyze*

While Dragon CFO Ellen Chamberlain was ultimately in charge of performing financial due diligence, Goldman assumed an important role in assisting her in the task. In a December 1, 1999 memorandum, the Goldman team stated that its next steps included "Conduct[ing] Due Diligence on [L & H]," which would be based on a 30–item due diligence list. From December 1999 through March 2000, Goldman sent multiple due diligence requests to L & H. There was never any dispute that Goldman would engage proactively in undertaking financial due diligence of L & H to assist Dragon.

On February 9, 2000, L & H released its Q4 1999 earnings and had an earnings conference call, which was reported in the Wall Street Journal on February 16. In that earnings call, L & H claimed its revenues in Asia went from $9.7 million in 1998 to $137.8 million in 1999, an increase of about 1,500 percent. L & H's growth in the United States and Europe was much slower.

On February 17, 2000, Chamberlain emailed the Goldman team and expressed her unhappiness with the pace of Goldman's due diligence on L & H. She specifically requested that Goldman "drive and analyze" the due diligence, and wanted to make sure that the team "punch[es] enough holes in [L & H's] 2000 budget so we are comfortable with what [L & H] are projecting as their [earnings per share] and can make our determination as to what we believe will happen with the [L & H] stock ..." The outstanding due diligence items included investigation into L & H's Asian revenues, L & H's year-over-year organic growth, L & H's major customers and contracts, L & H's key license agreements and royalty arrangements, and L & H's 2000 plan. These issues were part of Goldman's previous 30–item list, which Chamberlain attached to her e-mail and told the Goldman team to review. Some of the items were also explicitly mentioned in the e-mail.

After Chamberlain's drive-and-analyze email, the Goldman team "did another round of work on all these issues," circulated additional due diligence lists of questions, and prepared two evaluation books. The Goldman team did not get satisfactory answers from L & H regarding its Asian revenues, did not receive L & H's royalty arrangements or license agreements, did not ask for permission to call L & H's customers, and was not satisfied on the issue of L & H's organic growth. *See* Ex.

368A at 105:17–106:5, 39:5–15, 112:8–16; Ex. 368 at 211:7–18. In the valuation analyses of L & H in the draft evaluation books dated February 29 and March 3, the Goldman team simply included the future revenue projections they received from L & H.

### D. *February 29*

February 29, 2000 was a busy day for the Dragon transaction. At 4:13 p.m., Goldman sent the first draft of the evaluation book to John Shagoury. At 4:59 p.m., Goldman sent a memorandum to Dragon identifying a number of unresolved questions that Goldman had identified about L & H. *See* Ex. 186. This memo recommended "additional due diligence, led by accounting professionals on both sides," and that "Dragon's certified public accountants perform comprehensive due diligence on L & H, side by side with management, Hale & Dorr, and Goldman Sachs" on a number of enumerated issues, including L & H's revenues, related-party transactions, and accounting treatment of acquisitions. *Id.* Bamberg and Roth never received a copy of the memo.

At 5:00 p.m., Wayner arranged a teleconference call for the plaintiffs with Charles Elliott, Goldman's European software research analyst. The purpose of the call, set up at Janet Baker's request, was to update Dragon about Goldman's research on L & H and the L & H stock. Wayner said the call with Elliott was "one of the more important things" Goldman did to help the Bakers assess the value of L & H's stock. Elliott discussed how L & H accounted for goodwill, L & H's stock movements, L & H's growth through acquisition, and the effect on the European technology market of the decision by German pension funds to shift from fixed income to equity investments. *See* Ex. 1302 at BAKE030638; Ex. 193. Elliott was optimistic about how the stock market would react to the combination of Dragon and L & H.

Elliott was not covering L & H at the time of the phone call. In fact, no Goldman analyst had been covering L & H since Robert Smithson, an analyst who reported to Elliott, had departed Goldman weeks earlier in December 1999. While Wayner was aware that Goldman did not have an analyst covering L & H, he did not communicate that to anyone at Dragon. Because Elliott was not covering L & H, he did not listen to the company's February 9 earnings call or review relevant press coverage. Indeed, no one at Goldman had listened to the earnings call, which revealed the huge growth of Asian revenue. Elliott was "totally unaware of Lernout & Hauspie having any revenue in Asia" and would have been "very skeptical" if he had known of the revenue because he "kn[ew] something about Asian languages, and … the phonetic structure makes it incredibly difficult to take a European dictation software system and apply it … to Asian languages." As will be seen, the false reporting of the Asian revenue was the heart of the fraud.

Plaintiffs were aware of L & H's growing Asian revenues, and considered the matter to be an important issue. Janet Baker asked L & H "a lot of questions" about its Asian revenues. Tr. 65:16–18, Dec. 20, 2012. Ben Howe at SG Cowen, L & H's advisors, gave Janet Baker assurances that the "Korean revenues were a wonderful opportunity" for Dragon if it merges with L & H. Tr. 66:9–12, Dec. 20, 2012.

Also on February 29, at 8:24 p.m., Goldman and Dragon sent another memo to L & H proposing that due diligence be completed by March 3, with a proposed signing of the definitive merger agreement by March 8.

During this time, tensions were mounting between the Goldman team and Janet Baker and Ellen Chamberlain. Baker and Chamberlain became increasingly dissatisfied with Goldman's due diligence responses. Regarding the February 29 memo, Chamberlain testified that she found it "ironic that [the February 29] memo was written after I wrote a memo to Goldman Sachs telling them what my expectations were from a banker and pretty much they cut and pasted it back...." She added that the memo indicated that Goldman wanted an accounting due diligence team to be doing what "Goldman Sachs was supposed to be doing."

After sending the February 29 memo, the Goldman team remained dissatisfied with L & H's due diligence responses but did not reiterate their outstanding concerns to anyone at Dragon.

### E. The Napkin Agreement

On March 7, 2000, L & H announced that it had signed a definitive agreement to acquire Dictaphone Corporation, a company that was almost as large as L & H itself. As part of the deal, L & H assumed $425 million of Dictaphone's debt. While the Dictaphone transaction significantly altered L & H's financial outlook, the Goldman team never updated the evaluation book to include analysis of Dictaphone and the effects of this acquisition.

On March 8, 2000, Dragon CEO Don Waite of Seagate, the Bakers, L & H, and L & H's advisors SG Cowen held a meeting to discuss the terms of the proposed merger. No one from Goldman attended the meeting.[3] Roth and Bamberg also did not attend the meeting. At the meeting, L & H made a half-cash/half-stock offer of $500 million, lower then its initial offer of

$580 million. The Bakers rejected that offer. Instead, Janet Baker chose to pursue an all-stock transaction with L & H for $580 million. By the end of the meeting, Janet Baker and Roel Pieper of L & H signed a handwritten agreement setting forth a fixed exchange ratio for an all-stock acquisition of Dragon. This same exchange ratio was included in the definitive merger agreement on March 27, 2000. Janet Baker made this napkin agreement without consulting Goldman. While Goldman later became aware of both the all-stock deal and the lower price offer, Roth and Bamberg were never advised of the lower offer.

On March 22, Chamberlain set up a conference call with Dragon's accountant Arthur Andersen and L & H's accountant KPMG to discuss certain accounting due diligence issues mentioned in the February 29 memo. Alex Berzofsky from Goldman was also on the call. KPMG told Chamberlain that it anticipated no material adjustments to L & H's financials.

On March 23, there was a Goldman/Dragon conference call to review the work that had been done on due diligence, and the participants all agreed due diligence on L & H was completed. Although memories of the meeting differed as to who said due diligence was completed, everyone agreed that the Goldman team did not state they were still dissatisfied with due diligence, even though they were.

On March 27, Dragon held a meeting to consider the proposed acquisition of Dragon by L & H. In attendance at the meeting were: the Bakers, Bamberg, Roth, two Seagate representatives (including Chamberlain), Dragon's in-house counsel, Dragon's President, and Dragon's Vice Presi-

---

**3.** Wayner claims he was not invited, but this seems unlikely since SG Cowen, L & H's investment banker, was present. There is no contemporaneous documentation to assist on this point.

dent of Human Resources. Goldman was represented by Fine and Smith. They all sat around a table. Wayner called into the meeting from Argentina, where he was on vacation. During the meeting, Janet Baker asked the Goldman team to comment on the transaction. According to the minutes of the meeting, the Goldman team "noted that the combination of [Dragon] and [L & H] would create a significant critical mass of technology leadership. They noted that the currency for the Merger, the [L & H] shares, was rather volatile, but noted that market conditions in Europe for [L & H] were quite favorable." Ex. 255 at BAKE011627. Fine stated that Goldman's comments about the transactions were "positive in the overall." Ex. 379A at 471:15–16. The Board subsequently voted to approve the transaction, and the plaintiffs signed the merger agreement and the voting agreement. The transaction closed on June 7, 2000, the plaintiffs' Dragon shares were converted into L & H shares, and Goldman received its $5 million fee.

Goldman was dissatisfied with respect to L & H's answers on many due diligence questions up until the last moment. The transaction would likely not have gone forward if Goldman had voiced its ongoing concerns about financial due diligence. In his deposition, Wayner said he did not disclose any concerns he had about due diligence at the March 27 meeting because "the client did not ask." Ex. 368 at 311:21–22. At trial, Wayner added that he had already expressed his concerns to Chamberlain and Janet Baker, and it was Dragon's responsibility (not his) to ensure due diligence was complete. So he remained mum.

Wayner also believed that Janet Baker was in a hurry to get the deal done with L

& H because of Dragon's financial situation. On April 26, 2000, in a meeting with the Department of Justice to obtain antitrust approval of the merger, Dragon representatives[4] told Department of Justice officials that "Dragon needs L & H's resources to continue to survive." Tr. 56:18–19, Jan. 9, 2013.

### F. *Bankruptcy*

In the late summer of 2000, signs of L & H's fraud finally surfaced. On August 8, the Wall Street Journal reported that L & H had overstated its revenue in South Korea, and that some companies that L & H had identified as Korean customers said they did no business at all with L & H. On September 21, L & H announced that the U.S. Securities and Exchange Commission ("SEC") was conducting an investigation into its prior financial statements and that the company was fully cooperating with the investigation. On November 9, 2000, L & H announced it would restate its financial statements for 1998, 1999, and the first half of 2000. The company filed for bankruptcy on November 29, 2000. In a filing to the SEC on May 3, 2001, L & H confirmed that it improperly recorded $373 million in revenue, including all revenue reported in South Korea. Following L & H's bankruptcy and liquidation, the plaintiffs' shares became worthless. In addition to losing hundreds of millions of dollars, the plaintiffs lost the intellectual property they had worked 18 years to develop.

### III. DISCUSSION

### A. *Legal Standard*

Chapter 93A prohibits "unfair or deceptive acts or practices in the conduct of any

---

**4.** Dragon President John Shagoury testified that either he or Janet Baker made this statement to the Department of Justice officials, but could not recall which one of them said it. Tr. 57:2, Jan. 9, 2013. Furthermore, Janet Baker did not express any disagreement with that statement at the time. Tr. 57:12–14, Jan. 9, 2013.

trade or commerce." Mass. Gen. Laws ch. 93A, § 2. It provides a remedy for "[a]ny person who engages in the conduct of any trade or commerce" who, *inter alia,* "suffers any loss of money or property, real or personal, as a result of the use or employment by another person who engages in any trade or commerce of an unfair method of competition or an unfair or deceptive act or practice declared unlawful by section two." *Id.* § 11. "To prove such a claim, it is neither necessary nor sufficient that a particular act or practice violate common or statutory law." *Mass. Eye & Ear Infirmary v. QLT Phototherapeutics, Inc.,* 552 F.3d 47, 69 (1st Cir.2009) (citing *Kattar v. Demoulas,* 433 Mass. 1, 12, 739 N.E.2d 246 (2000)). Instead, Massachusetts courts "evaluate unfair and deceptive trade practice claims based on the circumstances of each case," leaving "the determination of what constitutes an unfair trade practice to the finder of fact." *Id.*

"An act or practice is unfair if it is within at least the penumbra of some common-law, statutory or other established concept of unfairness, is immoral, unethical, oppressive, or unscrupulous, and causes substantial injury to consumers (or competitors or other businessmen)." *In re Pharm. Indus. Average Wholesale Price Litig.,* 582 F.3d 156, 184 (1st Cir.2009) (internal quotations omitted). "The crucial factors in an unfairness inquiry are the nature of [the] challenged conduct and on the purpose and effect of that conduct." *Id.* (internal citations omitted).

"An act or practice is deceptive if it has the capacity or tendency to deceive." *Id.* at 185 (internal quotations omitted). "The plaintiff need not necessarily prove actual reliance on a misrepresentation; rather, the plaintiff must prove a causal connection between the deception and the loss and that the loss was foreseeable as a result of the deception." *Id.* (citing *Int'l*

*Fid. Ins. Co. v. Wilson,* 387 Mass. 841, 850, 443 N.E.2d 1308 (1983)); *see also Fraser Eng'g Co., Inc. v. Desmond,* 26 Mass.App. Ct. 99, 104, 524 N.E.2d 110 (1988) ("Nor is proof of actual reliance on a misrepresentation required so long as the evidence warrants a finding of a causal relationship between the misrepresentation and the injury to the plaintiff.").

Chapter 93A "does not attach liability for all of the unseemly business practices justly loathed by ... business professionals." *In re Pharm. Indus. Average Wholesale Price Litig.,* 582 F.3d at 185. "[T]he objectionable conduct must attain a level of rascality that would raise an eyebrow of someone inured to the rough and tumble of the world of commerce." *Id.* (internal quotations omitted). "[T]hat is to say, the defendant's conduct must be not only wrong, but also egregiously wrong." *Id.* (internal quotations omitted).

**B.  *Deference to the Jury***

There is no right to a trial by jury in an action under ch. 93A given the equitable nature of the relief permitted. *Nei v. Burley,* 388 Mass. 307, 315, 446 N.E.2d 674 (1983). A judge's "independent findings may be contrary to those found by the jury." *Guity v. Commerce Ins. Co.,* 36 Mass.App.Ct. 339, 340, 631 N.E.2d 75 (1994); *see Klairmont v. Gainsboro Rest., Inc.,* 465 Mass. 165, 186, 987 N.E.2d 1247 (2013) (" '[A] judge may make independent and, therefore, different, findings on the c. 93A aspect of a case that arises from the same facts which gave rise to parallel common law claims.' ")(quoting *Poly v. Moylan,* 423 Mass. 141, 151, 667 N.E.2d 250 (1996)); *Specialized Tech. Res., Inc. v. JPS Elastomerics Corp.,* 80 Mass.App.Ct. 841, 844, 957 N.E.2d 1116 (2011)("[M]any Massachusetts cases have held that a jury's verdict on related common-law claims is not binding on a judge who has

reserved determination of a c. 93A claim to herself.").

The trial court has the right to decide a jury was "dead wrong." *W. Oliver Tripp Co. v. Am. Hoechst Corp.,* 34 Mass.App.Ct. 744, 753, 616 N.E.2d 118 (1993); *see Perdoni Bros. v. Concrete Sys.,* 35 F.3d 1 (1st Cir.1994) ("[I]n the Chapter 93A context, the court has recognized that judge and jury, sitting as independent triers of fact, may reach conflicting conclusions.")(citing *Wallace Motor Sales v. Am. Motors Sales Corp.,* 780 F.2d 1049, 1063–67 (1st Cir. 1985)). "Nonetheless, a trial judge has discretion to consider a jury's findings in making an independent determination of a Chapter 93A claim." *Prof'l Servs. Group, Inc. v. Town of Rockland,* 515 F.Supp.2d 179, 196 (D.Mass.2007). "To the extent a party's Chapter 93A claims are based only on failed common law or statutory grounds, several courts have refused to find Chapter 93A liability." *Id.* at 194 (citing cases).

## C.  *Engaged in Trade or Commerce*

■ As a threshold matter, Goldman argues that the plaintiffs do not qualify as persons "engaged in the conduct of any trade or commerce" because no commercial business transaction occurred between the plaintiffs in their individual capacities and Goldman.

To maintain a claim under ch. 93A, a plaintiff need not establish privity of contract, " 'so long as the parties are engaged in more than a minor or insignificant business relationship.' " *Giuffrida v. High Country Investor,* 73 Mass.App.Ct. 225, 238, 897 N.E.2d 82 (2008) (quoting *Standard Register Co. v. Bolton–Emerson, Inc.,* 38 Mass.App.Ct. 545, 551, 649 N.E.2d 791 (1995)). In *Giuffrida,* the court held that the plaintiffs could maintain their ch. 93A claims "even though [the defendant] dealt with the plaintiffs as officers and shareholders," due to the fact that the plaintiffs had continuously communicated with the defendants regarding the sale of property for a period of one month. *Giuffrida,* 73 Mass.App.Ct. at 238, 897 N.E.2d 82. Similarly, in *Reisman,* the Massachusetts Appeals Court gave significant weight to the fact that a defendant "was in direct contact" with shareholder plaintiffs throughout a transaction involving the corporation. *See Reisman v. KPMG Peat Marwick LLP,* 57 Mass.App.Ct. 100, 125, 787 N.E.2d 1060 (2003).

In this case, Janet Baker, and to a lesser extent Jim Baker, were engaged in continuous communication with the Goldman team throughout the period in which Goldman was advising Dragon on the potential merger with L & H. While the Goldman team's relationship with Roth and Bamberg was not as significant, it "was more than trivial." *Id.* The plaintiffs were founders and principal shareholders of the closely held corporation. Roth and Bamberg communicated directly with the Goldman team during important meetings on December 16–17 & 20, 1999, February 29, 2000, and March 27, 2000. Goldman was aware that all plaintiffs were relying on Goldman's advice when deciding whether to proceed with the merger.

## D.  *Intentional and Negligent Misrepresentations*

The plaintiffs claim that Goldman violated ch. 93A based on alleged intentional and negligent misrepresentations made by Goldman employees throughout the L & H merger transaction. The misrepresentations pertain to the phone call with Charles Elliot, concerns regarding due diligence, and nondisclosure of Project Sermon.

"Generally, liability under G.L. c. 93A is premised on a wilful misstatement of fact." *Quinlan v. Clasby,* 71 Mass.App.Ct. 97,

102, 879 N.E.2d 703 (2008). "While the statute requires disclosure of all material facts known to a party at the time of a transaction, it does not impose 'liability for failing to disclose what a person does not know.'" *Id.* (quoting *Underwood v. Risman*, 414 Mass. 96, 100, 605 N.E.2d 832 (1993)); *see also Grossman v. Waltham Chemical Co.*, 14 Mass.App.Ct. 932, 933, 436 N.E.2d 1243 (1982)("A failure to disclose any fact, the disclosure of which may have influenced a person not to enter into a transaction, is a violation of c. 93A."). While "negligent misrepresentation is not ordinarily actionable under the statute," *Aquino v. Pacesetter Adjustment Co.*, 416 F.Supp.2d 181, 192 (D.Mass.2005), it "may be so extreme or egregious as to constitute a violation of G.L.c. 93A, § 11." *Marram v. Kobrick Offshore Fund, Ltd.*, 442 Mass. 43, 62, 809 N.E.2d 1017 (2004); *see also Synergy Communs., Inc. v. Citizens Bank*, 2003 WL 21246182, at *3, 2003 Mass.Super. LEXIS 136, at *10 (2003) ("In cases where the courts have found liability under c. 93A for negligent misrepresentations, the facts indicated a series of misrepresentations over a period of time, or at least more than a single response to a single inquiry.") (citing *Golber v. BayBank Valley Trust Co.*, 46 Mass.App.Ct. 256, 259–60, 704 N.E.2d 1191 (1999); *Glickman v. Brown*, 21 Mass.App.Ct. 229, 230–33, 486 N.E.2d 737 (1985)).

### 1. Charles Elliott phone call

■ The plaintiffs argue that Charles Elliott's positive comments about L & H on the February 29 conference call and Richard Wayner's failure to inform them that Elliott was not covering L & H were egregious misrepresentations violating ch.

93A. The Court disagrees. The plaintiffs have not proven that any positive comments made by Elliott were intentional or egregious misrepresentations. While Elliott did not discuss L & H's Asian revenues, at the time, he did not even know L & H had Asian revenues. Although plaintiffs believed Elliott was Goldman's L & H expert, Janet Baker's handwritten notes confirm that he was described on the call more generally as Goldman's European equities analyst. While Wayner should have informed the plaintiffs that no one at Goldman was covering L & H, he was at most negligent in not doing so. His failure to disclose that information is not egregious enough to violate ch. 93A, particularly since Goldman had only stopped covering L & H in December.

### 2. Due diligence concerns

■ Plaintiffs have a stronger case regarding the Goldman team's positive comments at the March 27 board meeting and failure to disclose their concerns about due diligence of L & H. Wayner and his team admitted that Goldman did not get satisfactory answers regarding L & H's Asian revenues and organic growth and did not receive its royalty arrangements or license agreements. When Janet Baker asked Goldman to comment on the transaction at the March 27 meeting convened to enable the Dragon board and principal shareholders to consider and act on the L & H merger, its comments were generally positive, and no Goldman team member mentioned any of these concerns. Outside of the February 29 memo, there is no other written evidence supporting Wayner's claim that Goldman repeatedly warned plaintiffs about due diligence concerns.[5]

---

**5.** Besides the February 29 memo, the evidence contains no e-mails, memos, handwritten notes, or documents communicated to Dragon indicating that Goldman was not satisfied with the due diligence responses it was getting from L & H or that it needed more time or resources to get satisfaction on outstanding issues. As such, there is no cor-

At the very least, in my view, the Goldman team should have disclosed their continuing due diligence concerns at the March 27 meeting or on the March 23 conference call, just a few days earlier. However, there is no evidence that their failure to do so was egregious. The Goldman team was likely of the view that they had passed the financial due diligence buck back to Ellen Chamberlain with their February 29 memo, and now it was her problem, not Goldman's. Wayner likely remained silent because of his view that Janet Baker was desperate to get the deal done due to the financial distress of the company. She had increasingly disregarded or not sought Goldman's advice. The napkin agreement was a key example of the growing gulf between them.

Even with a strained relationship, though, Wayner's omission of any statement with respect to dissatisfaction with the financial due diligence, especially in light of the positive statements about the transaction, was a negligent misrepresentation. Nonetheless, taking into account the jury's verdict in favor of Goldman on the plaintiffs' negligent misrepresentation claims, and the February 29 memo, the Court holds that Goldman's silence was not so egregious as to warrant ch. 93A relief.

Bamberg and Roth have additional claims, alleging that Goldman should have informed them about the February 29 memo and Janet Baker's rejection of a half-cash/half-stock deal on March 8. These claims fail because the Goldman bankers reasonably believed that Janet Baker and Chamberlain, their main contacts at Dragon, would inform the rest of Dragon's board and senior management about important events and documents leading up to the merger.

### 3. Project Sermon

■ Goldman's failure to disclose Project Sermon also does not violate ch. 93A. A year or so before the Dragon–L & H merger, Goldman decided not to invest its own money in L & H. In the late 1990s, Goldman's Principal Investment Area considered an investment in L & H, nicknamed "Project Sermon." As part of its due diligence, Goldman contacted L & H customers, but did not uncover any specific concerns about L & H. None of the Goldman team members on the Dragon assignment knew about Project Sermon. Moreover, there is no evidence as to why Goldman decided not to invest. The Goldman team did not knowingly withhold the information about Project Sermon from the plaintiffs. See *Fernandes v. Rodrigue,* 38 Mass.App.Ct. 926, 928, 646 N.E.2d 414 (1995)("Chapter 93A does not make actionable the failure to disclose a fact unknown to the person who the plaintiff thinks ought to have disclosed it.").

### E. *Professional Negligence*

■ Plaintiffs also contend that Goldman violated ch. 93A because it egregiously failed to exercise reasonable care and skill in providing professional investment banking services to them. The claim echoes plaintiffs' negligent performance of

roboration of Wayner's claim that he repeatedly told Chamberlain and Janet Baker of his due diligence concerns, which they deny. The paucity of documentation from the Goldman team may be due to Goldman Sach's written policy encouraging its mergers and acquisitions department not to safeguard their written notes. The policy tells investment bankers to keep "[n]otes support-ing due diligence," to throw out "[n]otes to self-citing unresolved problems," and "'[w]hen in doubt, throw them out,' unless litigation has commenced." Ex. 305 at WAYNER00000952. In any event, most likely the Goldman team sent out the February 29 memo (which one expert described as a "cover your bottom" memo), and then washed their hands of the matter.

services common law claims, rejected by the jury.

Where professional malpractice is at issue, to recover under ch. 93A, plaintiffs must prove more than "mere negligence." *Darviris v. Petros*, 442 Mass. 274, 278, 812 N.E.2d 1188 (2004); *see also Klairmont v. Gainsboro Rest., Inc.*, 465 Mass. 165, 176, 987 N.E.2d 1247 ("[It] bears emphasizing that at least in the absence of conduct that qualifies as unfair or deceptive, a negligent act or acts, alone, do not violate c. 93A."). Egregious professional negligence can constitute unfair conduct that violates the statute. *See Haddad Motor Group, Inc. v. Karp, Ackerman, Skabowski & Hogan, P.C.*, 603 F.3d 1, 6 (1st Cir.2010)(upholding professional malpractice-derived ch. 93A violation where accountant "failed to give proper [tax] advice" to client and "knowingly provided false information to the IRS" regarding client's tax obligations); *Lingis v. Waisbren*, No. 01–2747–E, 2006 WL 452942, at *6–7 (Mass.Super.Ct. Feb. 25, 2006), rev'd on other grounds, 75 Mass. App.Ct. 464, 914 N.E.2d 976 (2009); *Farragut Mortgage Co., Inc. v. Arthur Andersen LLP*, No. 95–6231–B, 1999 WL 823656, at *14 (Mass.Super.Ct. Aug. 5, 1999)(stating that "Arthur Andersen's 'gross negligence' in the performance of its professional services [could] also violate[ ] Chapter 93A").

The parties disagree over whether, as a matter of law, a professional malpractice claim against an investment banker is viable under Massachusetts law. The Court held it was.[6] The law is evolving nationwide.[7] No matter which way this legal dispute is ultimately resolved, Massachusetts caselaw is clear that under ch. 93A, a claim of egregious professional malpractice falls within the penumbra of a common-law concept of unfairness.

Plaintiffs argue that Goldman engaged in egregious professional negligence because of its failure to conduct important due diligence and financial analysis that professional investment bankers are supposed to do. The financial analysis which plaintiffs claim the Goldman team failed to do includes: analyzing L & H's royalty arrangements and license agreements, contacting L & H's customers (as it had done when considering its own investment in L & H), scrubbing the projections it received from L & H, participating in the February L & H earnings call, investigating L & H's increase in Asian revenues, and analyzing the implications of the Dictaphone acquisition to the all-stock Dragon–L & H merger.

Goldman contends investment bankers do not have an obligation to perform some of these items, such as contacting customers. For the other items, Goldman argues that Dragon's accountants were responsi-

---

**6.** Relying on Massachusetts caselaw, the Court instructed the jury on the elements of professional malpractice. *See, e.g., Askenazy v. Tremont Group Holdings, Inc.*, 29 Mass. L.Rptr. 340, 2012 WL 440675 (Mass.Super.Ct. Jan. 26, 2012) (allowing professional malpractice claim by individuals and entities who invested in Madoff hedge funds against the funds' auditing firm despite a lack of privity); *Meridian at Windchime, Inc. v. Earth Tech, Inc.*, 81 Mass.App.Ct. 128, 133, 960 N.E.2d 344 (2012) (citing *Nycal Corp. v. KPMG Peat Marwick LLP*, 426 Mass. 491, 495 n. 4, 688 N.E.2d 1368 (1998)) (discussing *Craig v. Everett M. Brooks Co.*, 351 Mass. 497, 222 N.E.2d 752 (1967), rule of liability to noncontractual third-parties).

**7.** A Tentative Draft of the Restatement 3d of Torts provides an action for "negligent performance of services": "One who, in the course of his business, profession, or employment ... performs a service for the benefit of others, is subject to liability for pecuniary loss caused to them by their reliance upon the service, if he fails to exercise reasonable care in performing it." Restatement 3d of Torts: Liab. for Econ. Harm § 6 (T.D. No. 1, 2012).

ble for completing them, such as analyzing L & H's financial projections, including the Asian revenues.

The evidence at trial was undisputed that Goldman agreed to provide financial advice and assistance which included performing valuation analyses. So the question is whether Goldman was egregiously negligent in providing this financial advice, assistance and valuation analysis. Neither party provided evidence of standards in the professional literature or even manuals directly on point. Goldman Sachs has a written policy manual describing in detail the due diligence obligations of bankers who work on financing transactions. *See* Ex. 326. To meet their due diligence obligations for financing transactions, Goldman bankers "will interview a number of persons connected with the issuer to discuss marketing, manufacturing, financial and other business matters. In particular instances, they may also interview the issuer's customers, suppliers, competitors, bankers, and other lenders." Ex. 326 at GS019000. While this manual is a helpful guidepost, Goldman has no such manual to provide guidance to investment bankers who provide financial advice, assistance and valuation services in mergers and acquisitions transactions.

At trial, three experts in investment banking gave their views on the professional standards applicable to performing due diligence for the seller in these transactions. The Bakers' expert Donna Hitscherich, a senior lecturer in the Finance and Economics Department at Columbia Business School,[8] testified that Goldman did not perform certain analyses customarily undertaken by global investment banks in this kind of transaction and did not provide financial services at the standard that Goldman sets for itself or the standards of the industry. Although she faults Goldman's performance and evaluation books on a number of fronts,[9]

---

**8.** Her credentials were the most impressive of the trio of experts at trial. She teaches basic and advanced corporate finance to MBA students as well as an advanced elective on mergers and acquisitions. Hitscherich is also the director of the Private Equity Program at the business school. She received her MBA from Columbia Business School and a JD from St. John's Law School, after which she worked in mergers and acquisitions at Skadden Arps for two and a half years. Prior to her position at Columbia, Hitscherich had a career in investment banking, during which she held positions at CS First Boston, J.P. Morgan & Co., and Banc of America Securities. As a vice president at J.P. Morgan, she was a senior member of the advisory review committee, which was responsible for all of the mergers and acquisitions fairness opinions issued by the company. As a managing director in the mergers and acquisitions group of Banc of America Securities, she was secretary of the firm's fairness opinion committee review and a major contributor to the firm's training programs for managing directors and associates. As an investment banker, Hitscherich worked with Goldman Sachs and represented a client who purchased a business that Goldman was selling. At Columbia Business School, she has had Goldman bankers speak to her mergers and acquisitions classes. She has given expert testimony in ten to twelve cases involving custom and usage in the investment banking industry, issues of due diligence, and issues of valuation analysis and techniques.

**9.** She testified that the Goldman team's two draft evaluation books were inadequate. For example, she pointed out that the Goldman team failed to source the projections, and to explain the basis for their projections. In her view, if they simply copied the future revenue projections they had received from L & H without any analysis, they should have made that clear in the evaluation books. While the evaluation book did contain a "sensitivity" analysis with a variety of valuation ranges, the Goldman team did not explain "the underlying reasons for their assumptions they made in that analysis." Tr. 43:10–12, Jan. 7 2013; Tr. 29:8–15, Jan. 7 2013. Hitscherich was "particularly distressed" not to see L & H's deal with Dictaphone analyzed by the Goldman team because it was a stock deal,

she primarily highlights the failure to check the projections regarding L & H's Asian revenues as the key lapse. She points out that no one from Goldman was on the earnings conference call on February 9, 2000, which revealed that Asian revenues had spiked about 1,500 percent to $137.8 million. This call was also covered in the business press, including the Wall Street Journal. Yet, neither Wayner nor anyone else at Goldman reviewed these publicly available figures with its lead European software analyst Elliott, who testified he would have been skeptical of them. Moreover, she faults Goldman for simply accepting L & H's projections without checking any licensing agreements with the Asian clients, or checking the clients themselves. Adequate due diligence would have disclosed that many of the licensing agreements were signed by the same person—a red flag.[10] In her view, Goldman was professionally negligent because it did not do its homework in getting the licensing agreements or checking the Asian revenues. Alternatively, if it could not check the projections out itself, Goldman should have cautioned Dragon against moving forward with the deal until L & H provided corroboration for the Asian revenues.

Frederick Ermel, another expert witness for the plaintiff,[11] also focused on the failure of Goldman to understand the significance of L & H's earnings conference call regarding Asian revenues. He testified: "They failed to pursue why those

Asian revenues spiked while revenues in the two largest markets for the company, meaning Europe and America, were flat." Tr. 32:3–5, Jan. 4, 2013.

Defendant's expert Ian Fisher[12] pointed out that the client is ultimately responsible for mergers and acquisitions due diligence on a counterparty. While he agreed that investment bankers have a role in providing financial advice and assistance on due diligence, in his view, Goldman fulfilled this obligation by drafting the due diligence lists and sending the February 29 memo. Fisher contends that an investment banker has a different standard of care when it is a financial advisor for a client in a mergers and acquisition transaction than it has when it is involved in other capacities: when it renders a "fairness" opinion, finances a transaction as an underwriter, or invests for itself or a client. In mergers and acquisitions, where the investment banker is providing financial advice and assistance to a client, Fisher contends that the standard of care is set by individual clients. "It's up to the client to decide how much due diligence it wants to perform, and if the investment banker is asked to assist in it, it will assist in that, but, ... there's no bright line test, the client has to make up its own mind." Tr. 145:12–17, Jan. 16, 2013. In his opinion, Goldman had no obligation to state its ongoing due diligence concerns at the March 27 board meeting because Dragon

and the Dictaphone deal would be diluting the Dragon shareholders' share in the new entity. Tr. 55:19–22, Jan. 7 2013.

10. Indeed the fraud was first disclosed when the Wall Street Journal reported on discussions with L & H's purported customers in Asia.

11. Now the managing director of the Carreden Group, he previously spent 14 years as a managing director with PaineWebber, and served as the deputy director of the Invest-

ment Banking Division and chair of the Fairness Opinion Committee.

12. Fisher went to the MIT Sloan School of Management and worked in mergers and acquisitions at Merrill Lynch from 1975 to 1995. Fisher then started his own one-man "major Wall Street firm" located in California, which gave advice to only two clients in 2011. He had never testified as an expert in court before.

management was responsible for the due diligence, and they were sitting at the table.

Fisher's testimony was not persuasive in that he failed to address why the Goldman team did not analyze the Asian revenues, scrub the projections received from L & H, or check the licensing agreements when providing the valuation analysis. If Fisher is right that it is up to the client to decide the level of due diligence, Dragon asked for this assistance in analyzing L & H's revenues, and it was not provided. Moreover, as a financial advisor, Goldman was paid to express its concerns to the plaintiffs at the March 23 and 27 meetings. Even though it was not paid an extra $600,000 for a "fairness" opinion, Goldman was paid $5 million for providing its advice and negotiating the transaction.

At oral argument, defendant argued that Goldman did express its concerns in the February 29 memo and advised Dragon to get an accounting firm to do an "accounting due diligence" on L & H to vet the growth in the accounts receivable. Hitscherich concedes that an investment banker does not do accounting and can properly rely on the counterparty's financial statements "to understand the business" and project "how the business is going to perform in the future." The analysis of L & H's future revenue projections, though, was Goldman's job, as Wayner himself testified. As Hitscherich testified, investment bankers "look[ ] at projections, perform[ ] sensitivity analysis around the projections, pok[e] holes in the projections, or what we call doing due diligence around the projections." Tr. 28:17–29:2, Jan. 7, 2013; see Tr. 42:8–43:3, Jan. 7, 2013. With respect to licensing agreements, Hitscherich said that "it's customary in [a mergers and acquisitions] deal for the banker … to understand any major contracts that they might have" in order to ensure the

revenues reported by the company are correct and sustainable. Tr. 44:6–22, Jan. 7 2013.

The valuation analysis should have taken into account Goldman's ongoing concerns with L & H's Asian revenues, ballooning accounts receivable, interrelated inter-party transactions, and licensing agreements, but none of those were included in Goldman's analysis. Tr. 43:15–44:1 Jan. 7 2013. Instead Goldman simply accepted the projections from L & H.

Based on plaintiffs' credible expert testimony, I conclude that the Goldman team's work on the transaction was professionally negligent by not adequately analyzing the Asian revenues, reviewing the licensing agreements, and scrubbing L & H's projections. The issuance of the February 29 memo calling for "comprehensive accounting due diligence" was not sufficient to meet Goldman's own ongoing financial due diligence obligations through March 27, 2000. Goldman, Arthur Andersen, and Dragon held a conference call with KPMG on March 22, 2000 to discuss open accounting issues, but Goldman never expressed any concerns that this call was not sufficient to address the concerns in the February 29 memo. Goldman points out that Dragon did not pay extra money for a fairness opinion. However, it still had a duty to use reasonable care in conducting financial due diligence consistent with standards of care in the profession. The reasons why small startup companies like Dragon go to a place like Goldman to assist with hatching their golden eggs is because they don't have their own expertise to analyze revenue projections by asking tough questions to potential merger partners.

Still, I give weight to the fact that the jury found for the defendant on this claim and there was sufficient evidence to support that finding even if I conclude other-

wise. Considering the jury's verdict and my own evaluation of the evidence, the Court finds Goldman's conduct was not so egregious as to warrant ch. 93A relief.

#### F. *Additional Ch. 93A Claims*

■ In its post-trial brief, Roth and Bamberg assert a variety of novel theories of ch. 93A liability that they never presented or mentioned at or before trial. They were not alleged in their complaint, not argued at summary judgment, and not identified in the joint pretrial memorandum. The Court rejects these new theories because defendant had no notice of them prior to and during trial, and had no opportunity to confront and rebut the evidence that allegedly supports them. *See DCPB, Inc. v. Lebanon,* 957 F.2d 913, 917 (1st Cir.1992) (rejecting plaintiff's post-trial attempt "to superimpose a new (untried) theory on evidence introduced for other purposes"). However, even if these new theories were timely presented, they are without merit.

#### 1. "Aiding and abetting" Janet Baker's misconduct

■ Roth and Bamberg contend that Goldman aided and abetted Janet Baker's breach of fiduciary duty and negligent misrepresentations to them. The Court need not address that contention. However, even if Janet Baker breached certain obligations to Roth and Bamberg by pushing forward with the merger without informing them of Goldman's February 29 memo or L & H's lower-priced offer, there is no evidence that the Goldman team "actively participate[d] or substantially assist[ed] in or encourage[d]" Janet Baker's alleged misconduct. *Arcidi v. NAGE, Inc.,* 447 Mass. 616, 623–24, 856 N.E.2d 167 (2006). Instead, Goldman and Janet Baker were at loggerheads.

#### 2. 940 CMR § 3.16(2)

■ Roth and Bamberg argue that Goldman violated a Massachusetts regulation regarding the disclosure of information to a buyer. The regulation states that "an act or practice is a violation of [ch. 93A] if [a]ny person … fails to disclose to a buyer or prospective buyer any fact, the disclosure of which may have influenced the buyer or prospective buyer not to enter into the transaction." 940 CMR § 3.16(2). However, "liability under the regulation attaches only to transactions involving private consumers, and not to business to business transactions." *Dental-Net, Inc. v. Aquino,* 291 B.R. 229, 241 (D.Mass.2003) (citing *Knapp Shoes Inc. v. Sylvania Shoe Mfg. Corp.,* 418 Mass. 737, 743–44, 640 N.E.2d 1101 (1994)). Because plaintiffs were not private consumers, the regulation does not apply in this case.

#### 3. "When in doubt, throw them out" policy

■ Roth and Bamberg contend that Goldman's document retention policy violates ch. 93A. The policy urges Goldman's mergers and acquisitions department to keep "[n]otes supporting due diligence," not to keep "[n]otes to self-citing unresolved problems," and "when in doubt, throw them out." Ex. 305 at WAYNER00000952. Although the policy is troublesome, it does not violate ch. 93A. There is no evidence that Goldman destroyed any relevant documents during this litigation. Even if it had, "there is … no cause of action for spoliation of evidence under G.L. c. 93A." *Gath v. M/A-COM, Inc.,* 440 Mass. 482, 498, 802 N.E.2d 521 (2003).

#### 4. Goldman's litigation strategy

■ Roth and Bamberg contend that Goldman's litigation strategy violated ch. 93A. *See Commercial Union Ins. Co. v.*

*Seven Provinces Ins. Co.*, 217 F.3d 33, 45 (1st Cir.2000) ("There may be litigation strategies that are so abusive as to warrant 93A liability...."). At summary judgment, Goldman argued that plaintiffs, Dragon principal shareholders, did not have any valid claim against Goldman because Dragon ceased to exist when it merged with L & H. Although the Court rejected Goldman's argument, *see Baker v. Goldman Sachs & Co.*, 2012 WL 5359540, at *1–2, 2012 U.S. Dist. LEXIS 155940, at *6–10 (D.Mass. Oct. 31, 2012), its litigation strategy was not so abusive as to warrant ch. 93A liability.

## IV. ORDER

The Court finds in favor of Goldman on all of the plaintiffs' ch. 93A claims, and enters judgment in favor of defendant.